STATE v. JOSEPH MICHAEL PINYATELLO.

(Filed 12 January, 1968.)

**1. Statutes § 10—**

Penal statutes must be construed strictly against the State and liberally in favor of the citizen with all conflicts and inconsistencies resolved in his favor, but the court will not adopt an interpretation which will lead to a strained construction of the statute or to a ridiculous result.

**2. Safecracking § 1—**

The elements of the offense defined by G.S. 14-89.1 include (1) the felonious opening by explosives or tools of a safe used for storing money or valuables, or (2) the felonious picking of the combination of a safe containing money or other valuables, and it is not a prerequisite to a prosecution under the statute that the safe broken into have a combination lock.

**3. Indictment and Warrant § 9—**

An indictment is sufficient in form if it expresses the charge against the defendant in a plain, intelligible and explicit manner and contains sufficient matter to enable the court to proceed to judgment and to protect the defendant from a subsequent prosecution for the same offense.

**4. Safecracking § 2—**

The indictment in this case *held* sufficient to charge the offense of safecracking, G.S. 14-89.1, and it was not necessary to allege that the safe broken into possessed a combination lock.

**5. Criminal Law § 61—**

Evidence of shoe print evidence is properly admissible for the purpose of identifying the accused as the guilty party when the attendant circumstances show that the prints were found at or near the place of the crime, were made at the time of the commission of the crime, and correspond with the shoes worn by the accused at that time.

**6. Same—**

Evidence by an expert witness that a latent heel print on an envelope found near the scene of a safecracking possessed some 35· points of similar characteristics, and no points of dissimilarity, with the heel of a shoe worn by defendant at the time of his arrest four days after the offense is competent when there is evidence that the shoe was worn by defendant at the time of the commission of the crime.

**7. Robbery § 4—  Shoe print evidence held sufficient to show defendant guilty of safecracking.**

The State's evidence tended to show that a safe was broken into by an axe and crowbar and that a sum of money was taken therefrom, that a white envelope left in the safe by the proprietor was found on the floor following the robbery with a latent heel print thereon, and that a comparison by an expert of the heel print on the envelope and the heel of a shoe worn by defendant at the time the crime was committed and at the time of his arrest four days later revealed some 35 points of similar characteristics and no points of dissimilarity. *Held:* The evidence was sufficient to go to the jury on the issue of defendant's guilt of safecracking in violation of G.S. 14-89.1.

**8. Criminal Law § 104—**

Evidence of the State that the defendant had a fifty dollar bill and a one hundred dollar bill on his person when he was arrested and that the victim of the safecracking testified that the largest bill in his safe was a twenty dollar bill, but that there were other numerous bills of lesser denominations, does not, standing alone, justify a compulsory nonsuit.

**9. Criminal Law § 106—**

Whether there is substantial evidence, direct or circumstantial, of each essential element of the offense, is a question of law for the court; whether circumstantial evidence points unerringly to defendant's guilt and includes every other reasonable hypothesis, is a question for the jury.

**10. Same—**

Motion to nonsuit should be denied if there is substantial evidence tending to prove each essential element of the offense charged.

**11. Criminal Law § 158—**

Where the charge of the court is not in the record, it will be presumed that the court correctly instructed the jury on every phase of the case with respect to both the law and the evidence.

APPEAL by defendant from *Canaday, J.,* 2 May 1967 Regular Criminal (2nd week) Session of WAKE.

Criminal prosecution on the following indictment:

"That Joseph Michael Pinyatello late of the County of Wake, on the 21st day of November, in the year of our Lord one thousand nine hundred and sixty-six, with force and arms, at and in the County aforesaid, unlawfully, wilfully and feloniously by the use of an axe and two crowbars and other tools did unlawfully force open and attempt to force open a safe and vault, the property of William McLaurin t/d/a McLaurin Parking Company located at 310 S. Salisbury Street, Raleigh, said safe and vault being used by said William McLaurin t/d/a McLaurin Parking Company for storing money and other valuables against the form of the statute in such case made and provided and against the peace and dignity of the State."

Defendant, who was represented by his present attorney of record, entered a plea of not guilty. Verdict: Guilty as charged of safecracking.

From a judgment that defendant be imprisoned in the State's prison for a term of not less than 20 years nor more than 25 years, he appeals.

*Attorney General T. W. Bruton and Assistant Attorney General Bernard A. Harrell for the State.*

*Carl C. Churchill, Jr., for defendant appellant.*

PARKER, C.J. Defendant assigns as error the denial by the court of his motion to quash the indictment made before pleading. The indictment is based upon G.S. 14-89.1, which reads:

"Safecracking and safe robbery. — Any person who shall by the use of explosives, drills, or other tools unlawfully force open or attempt to force open or 'pick' the combination of a safe or vault used for storing money or other valuables, shall, upon conviction thereof, receive a sentence, in the discretion of the trial judge, of from ten years to life imprisonment in the State penitentiary."

Defendant contends in his brief that the indictment is defective because a strict construction of G.S. 14-89.1 requires that the safe or vault broken into would be required to have a combination and that the indictment should at least read: "that the defendant did unlawfully, wilfully, and feloniously, by the use of an axe and two crowbars and other tools, force open and attempt to force open the combination of a safe and vault, the property of. . . ."

It is true that penal statutes are construed strictly against the State and liberally in favor of the private citizen with all conflicts and inconsistencies resolved in his favor. *S. v. Scoggin,* 236 N.C. 1, 72 S.E. 2d 97. Construing G.S. 14-89.1, it is manifest that the statute condemns (1) the felonious opening or attempting to force open a safe or vault used for storing money or other valuables by explosives, drills, or other tools, or (2) to pick feloniously the combination of a safe or vault used for storing money or other valuables. The felonious picking of a combination of a safe or vault is a safe robbery condemned by our statute. The word "pick" has a distinct meaning well understood by policemen, laymen, and courts alike. To adopt the reasoning of defendant would mean there can be no safecracking or safe robbery unless the safe or vault has a combination, which would lead to a strained construction of the statute and a ridiculous result, and it would mean that safes or vaults without combinations could

not be the subject of safecracking or safe robbery under G.S. 14-89.1. We have repeatedly held that all that is required in an indictment, since the adoption of G.S. 15-153, is that it be sufficient in form to express the charge against the defendant in a plain, intelligible, and explicit manner, and to contain sufficient matter to enable the court to proceed to judgment and thus bar another prosecution for the same offense. *S. v. Anderson,* 259 N.C. 499, 130 S.E. 2d 857; 2 Strong's N. C. Index, Indictment and Warrant, § 9. The indictment here accurately and clearly alleges all the constituent elements of the crime of safecracking condemned by G.S. 14-89.1 almost verbatim in the language of the statute. The court properly denied the motion to quash the indictment.

The State offered evidence; defendant offered none. Defendant assigns as error the denial of his motion for a judgment of compulsory nonsuit made at the close of the State's evidence.

The State's evidence tends to show the following facts: On 21 November 1966 William McLaurin, d.b.a. McLaurin Parking Company, owned and operated eight parking lots in Raleigh, one of which is situated at 310 S. Salisbury Street. The building on South Salisbury Street contains the central office of McLaurin Parking Company. In the back office of the South Salisbury Street premises there was a safe used for storing money. About 3 p.m. on Sunday, 20 November 1966, McLaurin went to this place of business and was there alone checking on Friday's and Saturday's receipts until about 5 p.m. The parking lot was not open for business at that time. Before leaving he placed in this safe various checks, an undetermined amount due employees for a day or two of work, about $200 due employees for the prior week's work, and $1,303 in parking receipts. He then locked the safe as was customary. There was one door opening into the inner office where the safe was, and it was locked when he left at 5 p.m. that afternoon. The money he locked up in his safe consisted of ones, fives, tens, twenties, and coins. He does not recall any bills larges than a twenty.

At approximately 7:30 a.m. the following morning an employee who opened the place of business telephoned McLaurin, and he arrived there shortly thereafter. The door to the office in the building where the safe was situated had been pried open. The door of the safe had been torn off and was lying about two feet from the safe itself. Both the interior and exterior of the safe were totally demolished. There was nothing in the safe and his money was gone. Drawers in the safe had been taken out and searched, and the papers therein thrown about the office. He was shown an envelope marked for identification as State's Exhibit No. 1. This envelope was white and clean when he locked it in his safe the Sunday afternoon before.

It had contained $50 belonging to the wife of a former employee, Cliff Peele. The door to the office in which the safe was kept was pried open with the "figure" of a crowbar stuck in it. He had a safe in the ticket office. This safe was not torn up nor did it show any signs of damage. On this particular occasion there was not anything of value in that safe.

About 1 a.m. on the morning of 23 November 1966 at the corner of Holden and Watauga Streets in the city of Raleigh, Calvin Heath, a member of the Raleigh police department, arrested defendant for public intoxication and carried him to the county jail. He asked defendant to remove his shoes, which he did. A cardboard tag was marked and attached to the shoes which were then turned over to the county jailer. Defendant's shoes were introduced in evidence and marked State's Exhibit No. 2.

J. H. Ross is a Raleigh police officer and has been a member of the City-County Bureau of Identification since September 1966. He went to the McLaurin Parking Company building located on South Salisbury Street about 7:30 a.m. on 21 November 1966. He was the first officer to arrive at the scene. He found the safe in the inner office torn open, papers scattered on the floor, and a general disarray. He proceeded to check the safe and the papers for evidence. He dusted papers with fingerprint powder, and a heel print appeared on an envelope among the papers on the floor. This envelope was on the floor about two feet from the safe when he picked it up. It had on the front of the envelope "McLaurin Parking Company." On the back of the envelope was the heel print. The heel print was on the side opposite the one on which "McLaurin Parking Company" was written. He took that envelope and secured it. It was marked State's Exhibit No. 1. It is in substantially the same condition now as when he took it in his possession. When he put the fingerprint powder on the envelope, it made the print and at the same time soiled the paper. He saw on this envelope a heel print with a cat's face. He did not know how long the heel print had been on the envelope. He secured no fingerprints. He took in his possession at the scene of the robbery an axe and a crowbar.

M. L. Stephenson, a detective with the Raleigh police department, was assigned to investigate the safe robbery at McLaurin Parking Company. He got State's Exhibit No. 1 (the envelope) from Ross and State's Exhibit No. 2 (defendant's shoes) from the jailer. He carried them to Steve Jones of the State Bureau of Investigation. He knows Clifford Peele and his brother. He saw defendant and Lewis Morgan going into and coming out of a house at 701 East Franklin Street on numerous occasions. He does not know which one of them owned the house or rented it. He personally observed that

house for about three weeks on several different occasions all night long. He observed Clifford Peele and his brother and defendant going and coming from that address. He did not sign any warrants for the two Peele brothers. To his knowledge they have never been charged with this offense or any complicity in it. He has never talked to the Peele brothers. He has seen the defendant with either one or both of them several times during November. The two Peele brothers had worked for McLaurin.

Steve Jones testified in substance: He is in charge of the identification of the photography section of the State Bureau of Investigation in Raleigh. He has been with that Bureau for four years and five months. He received State's Exhibits Nos. 1 and 2 on 23 November 1966 from Detective Sergeant M. L. Stephenson, and they have been in his possession since their receipt. He has had three months intensive training with the Federal Bureau of Investigation at Washington, D. C., in the field of identification. He worked for the Federal Bureau of Investigation in Washington for two years and six months, and he has been engaged actively in identification work with the State Bureau of Investigation in Raleigh in fingerprints, palm prints, shoe tracks, etc., for the past four years and five months. Since he has been with the State Bureau of Investigation, he has had occasion to make comparisons of latent shoe prints with the actual shoes themselves. For the past six months, starting in October 1966 through March 1967, he has had for examination an average of 1,869 prints per month. On 23 November 1966 he made a visual comparison of State's Exhibit No. 1 with the heel of the shoe, State's Exhibit No. 2, by using a "five power magnifier to pick out certain characteristics of wear on the shoe and on the impression left on the paper and by using a divider to measure my distances and pointer to keep with the exact location in which I was working with." The court held that Steve Jones was an expert in the field of shoe prints and heel prints and in comparing them for identification purposes. He testified as follows:

"It is my opinion that the item submitted as State's Exhibit 2 did make the impression left on the envelope submitted as State's Exhibit 1; and specifically, I refer to the heel of the shoe, State's Exhibit 2. The things that caused me to form this opinion were: the wear, the location on the heel print which is on the shoe shows wear in several locations and which it does not show wear; there are several scars or cut places on this heel print which show up on the impression left on the envelope in the same location with the same distance measured by dividers, as on the heel of the shoe and measuring from different points

on the heel of the shoe and measuring the same point on the envelope, all the measurements came out the same.

"Q.   Now, Mr. Jones, can you classify the points that you used for identification with respect to whether or not they are part of the heel as opposed to having been not as a part of the heel but placed on there for some other fashion?

"A.   The points I used mainly for my identification are the points that are not part of the heel as it is made by the factory —

\*       \*       \*

"A.   That is shown in the wear and cuts where there are rocks or glass still embedded within this shoe heel.

"I did say that I examined this under a five power magnified glass. To point out to the jury some of the markings on this shoe used for the purpose of identification that were not built into the heel, we have wear coming to here, which we have a ridge coming around here, here we have a point which is eat out; we have a crest here which has been cut out of this section; we have two located at this circle; we have this large cut here showing a piece of glass or rock or something, of which I did not dig out; we have our wearing on around here covering two or three dots or circles which are imprinted here; we have some wear which shows on these three toes of the cat's paw, on the upper left ear as it faces you; we have wear shown which is not shown on any portion of the ear, on the top of the head to the tip, there the tip shows wear, which is located and shown on this envelope. There are several points on here which are in the design which I also used to help me make this identification, such as the impression — not the impression, indentation of this area here and around in this area. (The witness was then asked to point it out to the jury at the other end of the jury box.)

"As I was pointing out here showing the wear, stopping here; this indentation of where it seems to be dug out, also a crest across this portion of the rubber circle, where the nail hole is; two cuts or crests across the rubber circle on this nail hole; a larger cut, scar with a piece of glass or rock embedded here around this circle of rubber and the wear on this portion where you can see this ridge coming around and you have the three cat's paw showing wear. The fourth one does not show wear. The tip of the ear shows wear but in here it does not. (The witness was then asked to point out these areas to the jury in the center of the jury box.)

"As I stated coming to right here, where this crest stops shows wearing beginning, one cut crest across here, on this rubber circle around the nail hole, two here, one here, cut places, cuts or crests. Wear continues to show all the way around and right here we have a big cut, piece of glass or rock embedded shown; we have the wear coming on around here; also have another line or crest which comes here showing wear; this crest down, we have three cat's paws out of the four showing wear, the other one does not; we have the tip of the ear that shows wear which does not show up here.

"Concerning the nail holes and the circular portion around the nail hole, I was able to observe that this shoe has 8 nail holes; the third one on your right, as you are looking at this heel, is wider on the front side than it is on the back side, which has this crest that I pointed out at the second point, which also shows up on this impression represented on State's Exhibit 1, the envelope.

"This one which would be the second one from the front of the heel on the left side as you face it, my right, is indented so as it does not leave but just a very faint edge on the impression on the envelope which it does not show any wear here.

"To the best of my knowledge, there are 11 different identifying points or marks there that were not built into the shoe heel but occurred by some other method I used in making or reaching the opinion that the heel on State's Exhibit 2 made the print on State's Exhibit 1. I counted somewhere between 20 and 25 points that were built into the shoe heel or a part of the shoe heel as opposed to some mark or points made by extraneous manner that I used in the identification of this print; this would make a total of 35 to 36 total characteristics. I did not count every little item that I come across but these are the main characteristics which I used. I do not depend upon the magnifying glass to bring this out enough so I could see it, not entirely; I examined it with my naked eye first.

"(The witness was asked to show to the jury the back of the heel print and the front of the heel print of State's Exhibit 1, the envelope, as it corresponds with the back of the heel of the shoe and the front.) This would be the back of the shoe, across here would be the front of the shoe showing the cat's face, cat's paws and the writing down here. You can see a S and P, a profile, and you will notice, if you look at this that it shows the cat's paw pointing to the right. On this the cat's paw is pointing to the left. This is reversible because it is a shoe track on an

object. When you put the shoe down, you can set it down and it will fit squarely on top the shoe track. To make your comparison, you have to look at your shoe and remember that this side of the shoe corresponding with this side of the latent, of the impression left on this. Therefore, this is why the difference in the way the cat's paw is pointing and in the difference in which ear shows the wear but this impression was made by the left heel and not the right heel because of the design of this shoe.

"Your right heel has this high point on the outside also. I was able to determine that it was the left shoe that made the impression prior to the time that other shoe was sent to the Federal Bureau of Investigation. As to your question was that because of the way the cat's paw was pointing and I knew it was upside down and the other things, to the best of my knowledge Mr. Stephenson had both of the shoes at the lab at this time. I did just keep only one shoe.

"I did measure the location of those points of identification, that were not built into the shoe or heel but were put there by some extraneous fashion, in relation to each other on both the heel and on the print on State's Exhibit 1; I went into this prior — I did measure on the heel print, on the shoe, I measured from one point to the other, certain other points all the way around this one point to make sure they were all the same. Doing the same thing on the impression of the envelope with the dividers. These measured distances on the heel did come out to be the same as the measured distances on the envelope. That was a part of what caused me to form the opinion."

He testified as follows on recross-examination:

"I could not find any points of dissimilarity. The pointer did not show any dissimilarity; I have been over it thoroughly. I cannot distinguish it. I would say that is a fairly good print; it is one of the better ones I have examined."

When defendant was arrested, there was taken from his person $572 in United States money in denominations of ones, fives, tens, twenties, fifty and hundred. There was one fifty dollar bill and one one hundred dollar bill, and the rest in small bills. This money was kept for defendant while he was in jail by the jailer.

Footprint evidence, like fingerprint evidence, is usually offered and admitted in evidence for the purpose of identifying the accused as the guilty party and to connect him with the crime. In respect to footprint evidence, Ervin, J., said for the Court with his customary clarity and accuracy in *S. v. Palmer,* 230 N.C. 205, 52 S.E. 2d 908:

"In the nature of things, evidence of shoeprints has no legitimate or logical tendency to identify an accused as the perpetrator of a crime unless the attendant circumstances support this triple inference: (1) That the shoeprints were found at or near the place of the crime; (2) that the shoeprints were made at the time of the crime; and (3) that the shoeprints correspond to shoes worn by the accused at the time of the crime. [Citing numerous authority.] Similar criteria apply to evidence of automobile tracks offered to identify the owner of a motor vehicle as the perpetrator of an offense. [Citing authority.]

"Moreover, the bare opinion of a witness that a particular shoeprint is the track of a specified person is without probative force on the question of identification. [Citing authority.] Wharton's Criminal Evidence (11th Ed.), section 934. The great master, Dean Wigmore, had this to say on this phase of the law of evidence: 'No doubt a witness to identity of footmarks should be required to specify the features on which he bases his judgment of identity; and then the strength of the inference should depend on the degree of accurate detail to be ascribed to each feature and of the unique distinctiveness to be predicated of the total combination. Testimony not based on such data of appreciable significance should be given no weight.' Wigmore on Evidence (3rd Ed.), section 415."

In *S. v. Walker*, 226 N.C. 458, 38 S.E. 2d 531, the defendant was guilty of raping a thirteen-year-old girl. He was found guilty by the jury of rape as charged in the bill of indictment and sentenced to death by asphyxiation. On his appeal this Court found no error in the trial. What the Court said in its opinion about footprints is relevant here:

"Assignment of error No. 6 is based on an exception to the action of the trial court in allowing a Deputy Sheriff to testify that near the scene of the attack footprints were seen which the officers followed to a tobacco barn at which the defendant said he had been curing tobacco. From the tobacco barn the footprints led to the defendant's home. The right-hand print was made by a shoe which was broken across the toe. The left-hand print was made by a smooth shoe with a worn heel containing two tacks. Shoes found at the home of the defendant were fitted into these prints at various places between the home of the defendant and the place of the alleged assault.

"The evidence which tended to show that the tracks into which the shoes of the defendant were fitted, were made by him, was competent. [Citing numerous authority.]"

In *S. v. Cox*, 201 N.C. 357, 160 S.E. 358, defendant was tried and convicted of highway robbery. What the Court said in its opinion about foot tracks is relevant here:

"G. H. Ballard, husband of the prosecutrix, testified as a witness for the State. Soon after his wife cried out that she had been assaulted and robbed, this witness went to the place where she said that the assault and robbery occurred. He there found the tracks of two men, and a woman. He measured, with care, the tracks of the two men and testified in detail as to the measurements of each track. After the defendant Elmer Whitley was arrested, the witness measured his shoe. He testified over the objection of the defendants that the measurements of Whitley's shoe 'exactly checked with those of the larger track.' He further testified in detail as to the measurements made by him of Whitley's shoe. These measurements were identical. Defendants' objections were properly overruled. If there was error in overruling the objection to the statement of the witness that the measurements of Whitley's shoe exactly checked with those of the larger track, the error was harmless, in view of the subsequent testimony of the witness, as to the measurements made by him of the shoe. Of course, it was for the jury to determine from the evidence whether or not the measurements of Whitley's shoe exactly checked with those of the track at the place where the robbery was committed."

In the trial the Court found no error.

In *S. v. Warren*, 228 N.C. 22, 44 S.E. 2d 207, the Court said, which is pertinent here:

"The defendant Brown assigns as error the admission of evidence tending to show that one of the shoes worn by him when he was arrested had a sole worn down to the canvass, that the shoe made a peculiar mark on the ground, and that this shoe fit perfectly into tracks found in the cornfield where Broyhill slept on the night of 15 July 1946. This evidence was competent and the assignment of error cannot be sustained."

In *S. v. Morris*, 84 N.C. 756, defendant was convicted of murder, and this Court found no error in the trial. As correctly stated in the first headnote in our Reports, the Court held:

"On a trial for murder where the prosecution relies upon circumstantial evidence, it is competent to prove that certain tracks were measured and on comparison corresponded with the boot of the prisoner in size and shape; and this, where the measure-

ment and comparison are made without the presence of the prisoner or previous notice to him. It is not necessary that a witness should be an expert to entitle him to testify as to the identification of tracks. *State v. Reitz,* 83 N.C. 634."

In *S. v. Ragland,* 227 N.C. 162, 41 S.E. 2d 285, the Court said:

"It is well settled with us that the similarity of footprints is admissible in evidence as tending to identify the accused as the one who perpetrated the crime. The probative value of such evidence depends upon the attendant circumstances."

To the same effect see *S. v. Mays,* 225 N.C. 486, 35 S.E. 2d 494.

In *State v. Burley,* 95 N.H. 77, 57 A. 2d 618, defendant was indicted and convicted of burglary. The trial in the lower court was upheld. In that case the Court held that in a burglary prosecution permitting the State to establish defendant's guilt by identifying human fecal matter which was found on the insteps of both of defendant's rubbers which lay beside the bed where he slept in his home the morning after the burglary was committed, with such matter smeared and tracked over the floor of the burglarized store and bearing the imprints of the rubber, was proper. The Court further held that in this burglary prosecution expert testimony that markings or striations in the imprint on the floor of the burglarized store were consistent with the defendant's rubber was properly admitted to establish defendant's guilt.

In *State v. Mihoy,* 98 N.H. 38, 93 A. 2d 661, 35 A.L.R. 2d 852, a verdict of breaking and entering a diner in the nighttime was approved by the Supreme Court of New Hampshire. The evidence consisted in part of photographs and plaster casts of shoe marks at the scene of the crime and their correspondence to shoes worn by the accused at the time of his arrest. The Court, speaking by Kenison, C.J., said:

"Since there were no fingerprints to implicate the defendant and he was not placed inside the diner by an eye-witness, it is urged that his motion for a directed verdict of not guilty should have been granted. It is a well settled proposition that crimes involving theft may be proved by circumstantial evidence. *State v. Burley,* 95 N.H. 77, 57 A. 2d 618; Underhill, Criminal Evidence (4th ed.) 1202; *State v. Gobin,* 96 N.H. 220, 222, 73 A2d 430. Photographs and other reproductions of footprints and shoe marks were properly admissible to show their correspondence with the shoes that were worn by the defendant at the time of his arrest. Annotation 31 A.L.R. 204; Scott, Photographic Evidence (supp.) § 721. The trademark 'Ritz' on the heel of the

footprints outside the diner and on the heel of the shoe worn by the defendant, together with the distinctive impression made by the outside sole of the shoes worn by the defendant, were competent evidence for the jury on the identity of the defendant."

See an elaborate annotation in 35 A.L.R. 2d 856-891, entitled "Footprints as evidence."

*S. v. Batts,* 269 N.C. 694, 153 S.E. 2d 379, relied upon by defendant in his brief is factually distinguishable. The State's evidence in that case considered in its strongest light merely showed the morning following the loss of the property that shoe tracks which were made by the defendant's shoes, or ones identical to them, were found where the stolen property was discovered. These tracks started in a cornfield adjoining the prosecuting witness's yard, but could not be traced (if they were present) through the grass in her yard to her house. The Court in that case properly held that the evidence was insufficient to convict the defendant. The evidence in that case is a far cry from the evidence in the instant case.

In *S. v. Thorp,* 86 N.H. 501, 171 A. 633, 172 A. 879, a conviction of murder was upheld where evidence was introduced, along with other evidence, to show that footprints were found on the blood-stained linoleum where the deceased was killed, such footprints matching the soles and heels of defendant's shoes, which had rubber heels on which was stamped a trademark consisting of a shield and the word "Regent," and there were also distinctive marks on the soles of the shoes.

In *Keller v. People,* 153 Colo. 590, 387 P. 2d 421, the People established that the method of entry into the clothing store was through a glass skylight which had been broken. Beneath the skylight is an air-conditioning or heating unit and a conduit running parallel to the ceiling. Below these structures and some three feet north of the skylight a clothes rack was positioned on the top of which was a board. In the dust on the board a heel print was found. The right shoe which the defendant was wearing at the time he was apprehended and the portion of the board containing the heel print were sent to the laboratory of the Federal Bureau of Investigation in Washington, D. C. At the trial, a special agent employed in the laboratory of the Federal Bureau of Investigation as an examiner of shoeprints and tire treads testified that in his opinion the heel print on the board was made by the heel of the defendant's right shoe and no other. The Court held as stated in the first headnote of the Pacific Reporter: "Circumstantial evidence supported burglary conviction of defendant whose right shoe had made heel print on board in premises broken into and who was apprehended about 100

feet from where suitcase and contents taken from burglarized store were found."

It seems to be indubitable from the totality of the evidence that the State established these basic facts: (1) McLaurin's safe situated in a back office of his premises on South Salisbury Street was broken open by an axe and crowbar between 5 p.m. on Sunday, 20 November 1966 and 7 a.m. on Monday, 21 November 1966, and the contents therein consisting of more than $1,300 were stolen at that time. (2) About 1 a.m. on Wednesday, 23 November 1966 defendant was arrested at the corner of Holden and Watauga Streets in the city of Raleigh for public intoxication by Calvin Heath, a member of the Raleigh police department. (3) At the time of his arrest defendant was wearing shoes which were introduced in evidence and marked State's Exhibit No. 2. (4) When defendant was arrested there was taken from his person $572 in United States currency in denominations of ones, fives, tens, twenties, one fifty dollar bill and one hundred dollar bill. J. H. Ross, a Raleigh police officer and a member of the City-County Bureau of Identification, the first officer to arrive at the scene of the safe robbery, found papers scattered over the floor of the inner office where the broken-open safe was situated, and by the use of fingerprint powder he found the heel print of a shoe on the back of an envelope lying on the floor, which heel print was introduced in evidence and marked State's Exhibit No. 1. McLaurin locked this letter up in his safe Sunday afternoon, 20 November 1966, and at that time this envelope was white and clean.

Applying the rule laid down by Justice Ervin in S. v. Palmer, supra, it seems indubitable that (1) the heel print was found at the place of the safe robbery, and (2) that the heel print was made at the time of the safe robbery. The trial court correctly found that Steve Jones, a member of the State Bureau of Investigation, was qualified by training and experience as "an expert in the field of shoe prints and heel prints." Stansbury's N. C. Evidence 2d § 132 et seq. His testimony is set forth above in extenso, and he testified as to the features of the heel print and the heel of defendant's shoe he was wearing when he was arrested. He testified in minute detail to the said features, and the unique distinctiveness to be predicated of the total combination. He testified as follows:

"To the best of my knowledge, there are 11 different identifying points or marks there that were not built into the shoe heel but occurred by some other method I used in making or reaching the opinion that the heel on State's Exhibit 2 made the print on State's Exhibit 1. I counted somewhere between 20 and 25 points that were built into the shoe heel or a part of the shoe

heel as opposed to some mark or points made by extraneous manner that I used in the identification of this print; this would make a total of 35 to 36 total characteristics. . . . I could not find any points of dissimilarity. The pointer did not show any dissimilarity; I have been over it thoroughly. I cannot distinguish it. I would say that is a fairly good print; it is one of the better ones I have examined."

Applying the third test laid down by Justice Ervin, the expert testimony of Steve Jones would permit a jury to find a reasonable inference from his testimony that the heel print on the letter or envelope corresponds to a shoe worn by the accused at the time of the crime. It is true as contended by defendant that the State's evidence showed that when he was arrested he had on his person a fifty dollar bill and a hundred dollar bill and that McLaurin testified that he had no bill larger than a twenty locked in his safe the night it was robbed. It is true as contended by defendant that the safe in the ticket office which was empty was not broken open and that Cliff Peele might have known which safe contained money and which safe was empty of money. For all the record shows, defendant may have had the same knowledge. The weight and credibility of the testimony was for the jury and these contentions could well be argued before the jury by the defendant's counsel, as no doubt they were, but that standing alone would not justify a compulsory nonsuit of the State's case.

The State's evidence is circumstantial. The rule in respect to the sufficiency of circumstantial evidence to carry the case to the jury is correctly stated in an excellent opinion by Higgins, J., in *S. v. Stephens,* 244 N.C. 380, 93 S.E. 2d 431, as follows:

"We are advertent to the intimation in some of the decisions involving circumstantial evidence that to withstand a motion for nonsuit the circumstances must be inconsistent with innocence and must exclude every reasonable hypothesis except that of guilt. We think the correct rule is given in *S. v. Simmons,* 240 N.C. 780, 83 S.E. 2d 904, quoting from *S. v. Johnson,* 199 N.C. 429, 154 S.E. 730: 'If there be any evidence tending to prove the fact in issue or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury.' The above is another way of saying there must be substantial evidence of all material elements of the offense to withstand the motion to dismiss. It is immaterial whether the substantial evi-

dence is circumstantial or direct, or both. To hold that the court must grant a motion to dismiss unless, in the opinion of the court, the evidence excludes every reasonable hypothesis of innocence would in effect constitute the presiding judge the trier of the facts. Substantial evidence of guilt is required before the court can send the case to the jury. Proof of guilt beyond a reasonable doubt is required before the jury can convict. What is substantial evidence is a question of law for the court. What that evidence proves or fails to prove is a question of fact for the jury."

Considering the State's evidence in the light most favorable to it and giving it the benefit of every reasonable and legitimate inference to be drawn therefrom, it is plain that the total combination of facts shown by the State's evidence shows substantial evidence of all essential elements of the felony charged in the indictment and is amply sufficient to carry the case to the jury. The trial court properly overruled defendant's motion for judgment of compulsory nonsuit.

Defendant has numerous assignments of error. The Court has carefully examined all defendant's assignments of error which have been brought forward and discussed in the brief, and none of them shows error sufficient to disturb the judgment and verdict below. All are overruled.

The charge is not in the record. When the charge of the court is not in the record, it will be presumed that the court correctly instructed the jury on every phase of the case, with respect to both the law and the evidence. 3 Strong's N. C. Index 2d, Criminal Law, § 158.

In the trial below we find

No error.