# OCTOBER 3, 1945

### JIM THOMAS V. THE STATE.

No. 23162. Delivered October 3, 1945.

The opinion states the case.

*John B. McNamara* and *C. S. Farmer,* both of Waco, *Geo. S. McCarthy,* of Amarillo, *Kilmer Corbin,* of Lamesa, and *Curtis Douglass,* of Pampa, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

Dr. Roy Hunt, a practitioner of medicine, resided with his wife, Mae, and two daughters, Jo Ann, about six years of age, and Jane, about two years of age, in a five-room brick cottage situated a few blocks from the business section of Littlefield, in Lamb County. Dr. and Mrs. Hunt were last seen alive about 2:15 o'clock the morning of Tuesday, October 26, 1943, by guests who had visited in the Hunt home Monday night and departed at the hour mentioned.

About six hours thereafter—or 8:00 o'clock—Jo Ann, leading her sister by the hand, both clad in night clothes, went crying and screaming to the home of L. C. Grissom, a nearby neighbor. Grissom went immediately to the Hunt home and there found Dr. and Mrs. Hunt dead. Dr. Hunt had been shot in the head between the eyes with a pistol at close range. Death re-

sulted immediately. Mrs. Hunt died as a result of a blow inflicted with some instrument to the right side of her head. The swollen condition of her head and eyes indicated that death was not immediate. The condition, as well as the position, of their bodies was stated by one witness, as follows:

"Both bodies were on the bed, the bed being in the northeast corner of the room, the northeast room, and the bed was sitting back about two feet from the north wall, facing east, the head of the bed being to the east, and Doctor Hunt was on the left hand side of the bed, which would be the south side of the bed and Mrs. Hunt was on the north side. They were close together, with their heads to the east. They were tied together with a small cord and electric light wire, that is, their hands, and their feet were tied together with a wire cloths hanger, and there was a necktie around each one of their necks, but it wasn't drawn tight. Mrs. Hunt had a cloth across her mouth, a handkerchief, I believe, but she wasn't gagged, the handkerchief wasn't tight, just laying across her mouth. Doctor Hunt's right leg and Mrs. Hunt's left one were tied together with a wire coat hanger, and also a little leather belt, and it was tightly tied. Their legs were close together. There was also a small cord tied around Doctor Hunt's neck which came down around his arm, through his wrist watch and across and tied to Mrs. Hunt's arm, through her wrist watch and up around her neck. Also, a light cord was used to tie their arms together. I would say there was about four things used to tie them up with, one rope, two light cords, a wire hanger and a belt."

The light cord referred to, from which the covering or insulation had been removed, was obtained from a table lamp in the room. A silk comforter had been thrown over, and covered, the bodies. A piece of string some three or four feet in length lay on the comforter near the foot of the bed. As will presently be noted, the State relied upon this piece of string as a material identifying circumstance.

Dr. and Mrs. Hunt occupied the northeast bedroom where their bodies were found. The children occupied the southeast room. Access from one room to the other was through a hallway.

The murderer appears to have been seen by Jo Ann Hunt, who was six years of age at the time of the trial. We quote her testimony in full:

"* * I am six years old. I live at Vernon, Texas. I remember the night my Mother and Daddy died. I was in my bed room.

I saw a man there. I did not notice what kind of clothes he had on, but he was a big man and had on black shoes. He did not say anything to me, but he put me in the closet and shut the closet door. I did not hear him or see him at the bed where my mother and daddy were. I did not know my mother and daddy were dead until the next morning. I went back to sleep after the man was there. I slept in the closet all night. The bath room light was on and that was the only one. The man just stayed in the house a little while."

A search of the room and house was made by the officers. No finger-prints or other evidence tending to identify the murderer was therein discovered. Nothing was missed from the house as having been stolen. If the fatal bullet was recovered, it was not introduced or described in the evidence, nor does the testimony indicate the calibre of the pistol that was used. If there was blood on the bed or clothing of the deceased, the record does not so reflect.

Appellant has been convicted as the murderer of Dr. Hunt, and condemned to suffer the death penalty. He prosecutes this appeal and challenges the sufficiency of the evidence to sustain that conviction.

Appellant was a parolee from the State penitentiary and resided in Galveston County, to the limits of which he appears to have been restricted under the parole. He was in Galveston County on October 21, 1943, at which time he confided to Marie Hall that he was going fishing.

According to the witness S. L. Veazey, appellant arrived in Amarillo, Texas, on Saturday night, October 23, 1943, and went to Veazey's home, where he spent the night and made his headquarters while in Amarillo. Sunday, October 24, 1943, appellant borrowed the Veazey automobile and between 8:00 and 9:00 o'clock that night was seen at a cafe in Littlefield, Texas. He remained at the cafe about twenty minutes. He returned the automobile to the Veazey home that night about 11:00 o'clock and there spent the night. Monday afternoon, October 25, 1943, appellant borrowed the automobile of his friend Craig, who also lived in Amarillo, and between the hours of 8:00 and 9:00 o'clock that night (the night of the murder), he was again seen at the same cafe in Littlefield, where he ate his supper.

Appellant is next seen at the Veazey home in Amarillo about 8:00 or 9:00 o'clock Tuesday morning. Between 10:00 and 11:00

o'clock the same morning he returned the Craig automobile, after which he returned to the Veazey home for the remainder of the afternoon. Late Tuesday afternoon, appellant asked Craig to take him to Childress, Texas, as he had some business down there. Craig consented and drove him to Childress, arriving there about 9:30 o'clock that night. Some time around 11:00 o'clock Tuesday night appellant talked with Marie Hall at Galveston over long distance telephone. In this conversation Marie Hall advised appellant that the sheriff of Galveston County was looking for him and that he had better come on down. Marie Hall did not testify as to the place or origin of this telephone conversation. However, the State showed that at 10:30 o'clock Tuesday night a person giving the name of "Wilson" placed a long distance telephone call at Vernon, Texas, to Marie Hall's telephone number at Galveston, Texas, and that the call was completed around midnight Tuesday.

The last positive identification of appellant was when Craig left him at Childress. When or where appellant was arrested or taken into custody, the record does not reflect.

In going by automobile from Amarillo to Littlefield, two routes were available: one, an all-paved road and the other paved with the exception of eighteen miles. The distance over the paved route is one hundred twenty miles; over the other, one hundred seven miles. The distance from Amarillo to Childress is one hundred twenty to one hundred twenty-six miles, while Vernon is sixty miles from Childress.

S. L. Veazey, in whose home appellant visited, operated a garage and filling station on the same premises as his home. Included in the equipment of the garage was a buffing machine, being an electric motor to which was attached on one side a buffing brush of steel wire and on the other side an emery wheel. This buffing machine was used to roughen the surface of automobiles inner tubes in the repair thereof. While visiting in the Veazey home, appellant had access to the garage and at times assisted around the filling station. The key to the garage was kept on a nail inside the back door of the Veazey home and was accessible to use by appellant.

Veazey's family consisted of his wife and seventeen-year-old son, A. M. Veazey. A. M. Veazey played basketball as a high school student, in the playing of which he wore a pair of rubber-soled tennis shoes of a type and make generally used, sold, and obtainable for playing basketball. These shoes he kept at home.

Monday morning S. L. Veazey and his son left home for a deer hunt and were gone for a week.

The Craig automobile—borrowed and used by appellant on Monday—was at the time he took possession thereof equipped with what is referred to as a Lee tire on the right front wheel. The tire was so situated when appellant returned the automobile Tuesday morning to Mrs. Craig. Automobile tracks were found in the alley to the rear of the Hunt home. The track made by the left front tire was that of a Lee tire corresponding to that on the right front wheel of the Craig automobile. This fact was discovered some days after the murder, by comparing the tire on the Craig automobile with a cast taken of the tire track found where the automobile was parked in the alley.

Numerous foot tracks were found around the outside of the Hunt home, all corresponding and showing to have been made by the same person wearing a pair of tennis shoes. Plaster casts of some of these tracks were made and preserved. A few days after the murder and after appellant had left Amarillo, the A. M. Veazey tennis shoes were found in a closet of the Veazey home. These were compared with the casts of the tracks found at the Hunt home. With reference to this comparison, we quote from the testimony of the witness Gambill, as follows:

"* * I made an examination of these casts and shoes * * and the casts I found, by measurement and by observation * * were made by a shoe with the same design that these shoes have. The design in both the heel and the sole, where it can be seen, is the same design, the same type of design, having the same number of markings in the heel as there are in the cast. * * There is a discrepancy which existed on both casts and that is, there are raised places that show up in the cast which are not present on the shoe * * * there *is* three very noticeable bars in the cast, but you will notice on the shoe the bars are no longer there. That is the main discrepancy in the cast and the shoe. * * * In my opinion some type of abrasive has been used on the shoe, its the print made by a buffer wheel of some type. I believe I can show the jury where the shoes have been buffed. * * This shoe appears to me to have been buffed in this area right here. It doesn't show normal wear as it does in the sole. It appears to have been buffed right around this edge, the white part right here. It appears to have been buffed slightly in this area (indicating), and also right here."

Upon cross-examination the witness further testified:

"Now, on this right shoe, this mark here indicates to me it was made by some foreign substance having been rubbed on it. It doesn't have the same appearance as it has here, and back in this portion. Its clean and looks like it was freshly knocked off from the rubber. This I refer to is on the right shoe, just above the instep, on the outside and on the right hand side of the shoe. It seems to have been made by some buffing machine or some grinding like, or sand paper or something of that kind. It might have been done unintentionally by the man wearing the shoes, the use of it might wear it that way."

Upon re-direct examination, the witness further testified:

"Its my opinion these shoes, as they now are, could not have made the tracks shown on these casts, because there are bars, as I call them, present on the cast that *is* not present on the shoe, and these bars are in the same place the shoes appear to be buffed."

A. M. Veazey identified the tennis shoes as his. The last time he saw the shoes was Friday afternoon before the murder the following Tuesday morning. He asserted that the buffed places on the tennis shoes were not there when he last saw them. He was present when the officers took the shoes from the closet, but he did not at that time notice the buffed places thereon. It was not until some time thereafter when his attention was especially called thereto that he noticed the buffed places.

Reverting now to the piece of string or cord found lying on the comforter covering the bodies of Dr. and Mrs. Hunt:

This piece of string became identified in the evidence as State's Exhibit 6. Five days after the murder, officers making a search of the Veazey garage discovered in a gas stove a piece of string lying across the burner in the stove, in such a position that had the gas burner been lighted the string would have burned up. This piece of string, about two inches in length, is identified in the record as State's Exhibit 17.

Regarding these two pieces of string, the witness McLaughlin, chemist for the Texas State Department of Public Safety, testified:

"This string, marked State's Exhibit 6, was delivered to me, in the Laboratory at Austin, by Texas Ranger Redwine, on October 29th, 1943, and the string marked State's Exhibit 17 was delivered to me in Austin by Ranger Raymond Watters on, I believe, November 1, 1943, in order to make a study of those

strings as to their similarity, and in making the examination I observed them with the naked eye and also made an examination under a microscope in order to observe more closely the finer characteristics and features around each piece of string, and in my examination I found that both strings were cotton and had similar types of fiber, the kind of fibers making up the large string. They had the same number of string in each piece of strand, the finer string, as it is twisted there, has the same degree of twists and firmness, and also had the same diameter. A close definite measurement, or diameter, couldn't be made, due to the fact the string would give in making a measurement with the caliper. It was also noted the two pieces of string had similar types of cuts on the end of each piece of string. You will note, as you look at the string that one strand is cut, the string gives a little bit, and the next one is cut through. The strings, because of the looseness of them and the lack of a definite rigid condition could not be actually placed back togethed, but you can see how similar the two cuts are, how the cut ends of the various strands are alike on the two pieces of string, and both pieces of string had the same number of strands. I would say that the ends are similar, as shown here that I am holding up, and the cuts are similar on the two pieces of string. They are both very similar, being examined by the naked eye and under the microscope."

According to the testimony of Mrs. Veazey, appellant came to her home about 8:00 o'clock Tuesday morning while she and a Mrs. Herring—who was staying with her while the husband and son were on the hunting trip—were eating breakfast. Appellant, at her invitation, had a cup of coffee with them, and at that time said to Mrs. Veazey, "You had me locked out last night," to which Mrs. Veazey replied, "I thought I heard him." During the remainder of the day, or Tuesday, appellant stayed in and around the house and garage. He waited on a customer for gasoline. He washed some of his personal things, including a shirt. After appellant left, there was found in a closet a pair of trousers which belonged to no member of the Veazey family and was not in the house prior to appellant's visit. There was testimony showing that while appellant was in the Veazey home he wore a shirt, found in the home, which belonged to the Veazey's son-in-law. This shirt was found in a closet after he left.

When appellant returned the Craig automobile to Mrs. Craig on Tuesday morning and was asked why he had not returned the automobile sooner, he replied that he came by the Craig

534

apartment but on seeing no light therein, went out to the Veazeys and, being unable to get in there, went back to town.

The facts stated comprise the State's case, upon which the conviction was predicated.

Appellant did not testify as a witness in his own behalf.

There was defensive testimony tending to show that appellant was in Amarillo at the time the murder was committed. This defensive theory was pertinently submitted to the jury and by it rejected.

The State contends that the facts authorize the following deductions, viz:

(a) On Monday afternoon appellant drove the Veazey automobile from Amarillo to Littlefield in contemplation of the crime.

(b) On Tuesday he drove the Craig automobile from Amarillo to Littlefield and after eating supper at the cafe, drove the automobile to, and parked it in, the alley to the rear of the Hunt house and then stayed in and around the yard of the Hunt home until Dr. and Mrs. Hunt retired for the night.

(c) After leaving the cafe and before reaching the Hunt home, he donned the A. M. Veazey tennis shoes which he brought with him from Amarillo and with which he made the tracks found in the yard of the Hunt home.

(d) After Dr. and Mrs. Hunt had retired, he entered the house by and after raising a window in the southeast room and passed into the bedroom of Dr. and Mrs. Hunt and, finding them asleep, shot Dr. Hunt and struck Mrs. Hunt the fatal blow, after which he tied and trussed their bodies as indicated.

(e) Either before or after the murder, he was discovered by Jo Ann Hunt, whom he placed in the closet.

(f) Some time after leaving Amarillo and before parking the automobile in the alley, he transposed the front wheels or tires on the automobile—that is, changed the right front to the left front.

(g) After the murder and before returning the Craig automobile to Mrs. Craig, he changed the front tires back to their original position on the automobile.

(h) Some time Tuesday afternoon, by using the buffing ma-

chine in the Veazey garage, he buffed the soles of the tennis shoes worn by him, so as to effectually change the kind of tracks the shoes would make.

(i) The piece of string found on the comforter and that found in the stove in the Veazey garage was originally one piece of string and was in appellant's possession.

(j) The trip from Galveston to Amarillo, the departure from Amarillo the day of the crime, and the telephone conversations with Marie Hall both prior to and after the murder were circumstances indicating a "spot killing," or one for pay, which was the motive actuating the crime.

Do the facts in evidence warrant and justify the State's contention?

This question must be answered in the light of well and long established rules of law in this State governing and controlling the sufficiency of circumstantial evidence to convict for crime. These rules are:

In order to convict upon circumstantial evidence, the facts— that is, the combined and cumulative force of all the incriminating circumstances—must not only show the guilt of the accused but must also exclude every other reasonable hypothesis save and except his guilt, in determining which it is not permissible to base an inference upon an inference. Proof which amounts only to a strong suspicion or mere probability is not sufficient to support a conviction. 18 Tex. Jur., Evidence— Criminal Cases, secs. 320-321.

Where the identity of the accused as the person committing the crime charged depends upon tracks or foot-prints, the evidence must be so full and convincing as to leave no reasonable doubt, in determining which great strictness will be required in the testimony. 18 Tex. Jur., sec. 331, p. 454; Warren v. State, 52 Tex. Cr. R. 218, 106 S. W. 132; Carlisle v. State, 107 Tex. Cr. R. 408, 296 S. W. 889; Maxwell v. State, 109 Tex. Cr. R. 533, 5 S. W. (2d) 991; Ennox v. State, 130 Tex. Cr. R. 328, 94 S. W. (2d) 473; Johnson v. State, 130 Tex. Cr. R. 416, 94 S. W. (2d) 1160; Hamilton v. State, 131 Tex. Cr. R. 88, 96 S. W. (2d) 983; Baugh v. State, 134 Tex. Cr. R. 215, 115 S. W. (2d) 411.

Analyzing the facts in the light of the rules stated, we note:

Appellant was in Littlefield the night of the murder. He was, therefore, in position to have committed the murder. Such fact,

however, is equally true of all other inhabitants of Littlefield at that time. Proof, merely, that one has the opportunity or is in position to commit a crime is not sufficient to constitute proof of the commission of the crime.

So the State must place appellant at the scene of the crime, to establish which, reliance is had upon the tracks—foot and automobile. Jo Ann Hunt made no effort to identify appellant as the man she saw in the Hunt home. There is no question, then, but that the tracks form the basis of, and upon which, the State's case depends, and unless the foot-tracks were made by A. M. Veazey tennis shoes the State's case fails for the want of identification of the appellant.

These tennis shoes were of no special type, character, or design, but were of a make generally sold, used, and obtainable in playing basketball. By measurement and observation, the tracks were made by a tennis shoes of the same type or design and having the same number of markings in the heel as the Veazey shoes. This is as far as the State's testimony goes. There is no testimony showing any special characteristic or peculiarity in both the tracks and the shoes, as would authorize the conclusion that the tracks were made by only the Veazey shoes and could not have been made by other tennis shoes. The similarity between the tracks and the Veazey shoes is, therefore, general as distinguished from special.

Under the rules stated, especially the Warren, Ennox, Johnston, and Baugh cases, supra, the proof fails to measure up to the requirements of the law as would authorize the conclusion that the tracks were made by only the Veazey shoes. But conceding—for the sake of argument—that the tracks were shown to have been made by the Veazey shoes, there yet remains to be established the fact that appellant was the wearer of those shoes when the tracks were made. Appellant did not own the shoes. No one saw him wearing those shoes. The State was under the burden, then, of establishing, at least, that he could have worn them.

We have searched this record in vain for any testimony showing, or tending to show, the size of shoe worn, or capable of being worn, by the appellant. Whether or not the Veazey shoes were capable of being worn by the appellant is left as a matter of inference only. Since appellant was under arrest and in custody, the State appears to have been in position to have obtained a pair of appellant's shoes or to know the size of shoe worn by

him, and thus to have supplied this important detail. The fact that the State did not do so is a circumstance against it.

It is true that the tennis shoes were introduced in evidence and were therefore before the jury. We would have no right to presume that appellant could have worn them. By no hypothesis of reasoning can it be said that the State has shown that appellant was the wearer of the shoes which made the tracks.

What has been said touching the similarity of the foot-prints to the Veazey shoes as being general rather than specific applies equally to the tire tracks. There is nothing to indicate that the tire track was made exclusively by a Lee tire on the Craig automobile.

The State's case stands primarily upon proof identifying appellant as the maker of the tracks found at the Hunt home. This the State has failed to do by legal and competent evidence measuring up to the requirements of the law.

Whether or not appellant was the perpetrator of the horrible crime depicted by this record is not for us to say. We only know that in this land of ours the life and liberty of no man shall be exacted or taken from him as a penalty for crime, until his guilt has been first established in accordance with law. Such is the right guaranteed every citizen. It is the duty and responsibility of the courts to enforce and preserve that right. It is in the performance of that duty and in full consciousness of that responsibility we reach the conclusions herein expressed.

The evidence being insufficient to authorize the conviction, the judgment of the trial court is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.