(No. 71335.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CHARLES A. CAMPBELL, Appellee.

*Opinion filed January 30, 1992.*

HEIPLE, J., took no part.

Neil F. Hartigan and Roland Burris, Attorneys General, of Springfield, and Edward A. Burmila, Jr., State's Attorney, of Joliet (Kenneth R. Boyle, John X. Breslin and Jay Paul Hoffman, of the Office of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Verlin R. Meinz, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

Following a bench trial in the circuit court of Will County, defendant, Charles A. Campbell, was convicted of residential burglary (Ill. Rev. Stat. 1987, ch. 38, par. 19—3) and sentenced to five years' imprisonment.

The appellate court, with one justice dissenting, reversed defendant's conviction, holding that he was not found guilty beyond a reasonable doubt (205 Ill. App. 3d 591). We granted the State's petition for leave to appeal (134 Ill. 2d R. 315(a)).

The singular issue presented for our review, as framed by the State, is whether shoeprint evidence, standing alone, is sufficient to convict. We answer the inquiry in the affirmative. Therefore, we reverse.

### FACTS

Jeffrey Miller testified that on March 9, 1989, he resided at 308 Willard in Joliet, Illinois, a house also occupied by Susan Lewis Buchanan. On the morning of the 9th, he and Buchanan left for work together. That evening, shortly after 9 p.m., when Miller returned home from work, he found that the front door to the house was wide open, most of the lights inside the home were on, the house was in disarray, and there were wet, muddy footprints throughout the living room and kitchen. Bills, which had been on the kitchen table that morning, were scattered over the kitchen and living room floors. When Miller and Buchanan left home, however, only a small lamp in the living room had been left burning. Miller noticed also that a television and VCR

were missing. He then summoned the police. At about 10:30 p.m., after police completed their investigation, Miller left the house and picked up Buchanan from work.

On cross-examination, Miller testified that when he arrived there were wet, muddy prints on the linoleum kitchen floor and on the living room carpet. However, he could not testify as to whether a shoeprint on an Illinois Bell Telephone envelope, which one of the investigating officers found lying on the floor, was wet or dry. Miller testified that he did not know defendant and that he had not given anyone permission to enter the house on March 9.

Officer Rex Provensale, an evidence technician with the Joliet police department, was one of the officers who responded to Miller's summons. During his investigation, Provensale found an empty, Illinois Bell Telephone bill "window" envelope lying on the floor in the living room/dining room area of the house. There was a shoeprint on the envelope. Provensale examined Miller's shoes, as well as those of the other investigating officers at the scene. From his examination, Provensale determined that their shoes did not match the print on the envelope.

Provensale also retrieved a latent fingerprint from a videotape container which he found lying on the floor. The parties stipulated at trial that the fingerprint revealed no identification.

Provensale further testified that there was mud on the carpeting, but he did not recall whether there was mud anywhere else in the house. On cross-examination, he stated that he did not recall whether the shoeprint on the envelope was wet.

Officer Richard Fonck testified that on March 12, 1989, he was on duty as an evidence technician at the Joliet police station. While on duty, he encountered defendant, who was at the station on an unrelated matter. Fonck observed that defendant was wearing tennis

shoes, which when compared to a photograph taken by Provensale of the print on the telephone bill envelope, appeared similar in design. Fonck obtained defendant's shoes, which were subsequently sent to the State crime laboratory for examination.

Officer James Klancer testified that while he was on patrol on May 24, 1989, he observed defendant walking along a residential street with a group of individuals. Klancer stopped his vehicle, and without specifying the charge, informed defendant that he had a warrant for his arrest. After a foot chase, defendant was apprehended at his home.

Walter Sherk, a forensic scientist employed by the Illinois State Police crime laboratory in Joliet, testified that he had been with the forensic bureau of the crime lab for about 14½ years, working in the specific area of firearms, tool marks and shoeprints. Sherk further testified that he received a bachelor's degree in forensic science, and two years' on-the-job training in his field of expertise. Additionally, Sherk testified that he had attended a Federal Bureau of Investigation course in shoeprint identification, and that he attends annual lectures and meetings regarding shoeprint identification. In his career, Sherk testified, he has performed approximately 300 shoeprint comparisons and testified in approximately 15 cases on his shoeprint analyses.

Sherk testified that, for purposes of shoeprint analysis, class characteristics refer to the size and pattern of the shoe, and individual characteristics refer to such things as nicks, cuts, and scratches, which are picked up after the shoe has been worn over a period of time. In comparing shoeprints, an examiner looks for both types of characteristics.

Sherk stated that the Illinois Bell envelope bore two separate shoe impressions made by what appeared to be dust or dirt. He performed a comparison of the Nike

brand tennis shoes taken from defendant with the prints on the envelope. On the basis of dissimilar patterns, he concluded that the smaller of the two prints on the envelope could not have been made by defendant's shoes.

Sherk made a "test print" from defendant's right shoe for comparison with the larger print on the envelope. The "test print" was made by inking the sole of the shoe and stepping on white paper. The larger print showed two-thirds of the middle portion of a shoe. Based upon his comparison, Sherk found the shoe size and "patterns" consistent with defendant's shoe. Additionally, he identified six matching individual class characteristics. From this analysis, Sherk testified that he could positively identify defendant's right shoe as having made the larger shoeprint on the envelope.

On cross-examination, Sherk testified that there is no requisite number of characteristics necessary for an identification. Each identification depends on the uniqueness of the individual characteristics. Depending on what the marks look like, an identification could possibly be made based on two or three marks. Sherk testified that he could say neither where the envelope was when the print was made, nor when the print was made.

Sherk testified that if a shoe is worn for some period of time after the shoeprint is placed on an exhibit, some change in the shoe's characteristics could occur. Further, on cross-examination, the following colloquy occurred:

"Q. [Defense attorney]: Are there any dissimilar points in the shoe and in the print on the envelope?

A. There are points, yes. There are dissimilarities, obviously, that may not show up on the test print or the evidence.

* * *

Q. I'm saying did you find some dissimilar points, some things that were on the envelope that weren't on the shoe?

A. Well, there may be, but I didn't look for dissimilarities. I mean. It's granted that there are dissimilarities in the shoe. There are points that are not going to possibly match up. You're talking about the wear, after the shoe print was on the shoe. And there may be—

THE COURT: *** How can you know if a dissimilarity is wear or how can you know if a dissimilarity was there before or after the offense?

A. There are a number of factors that come into play. There could be dirt on the portion of the shoe that is not there when I have the shoe, that was there at the time the shoe print was made.

THE COURT: But how would you know that?

A. I don't know that, if there was or there wasn't.

THE COURT: Would you presume that if there was a dissimilarity?

A. I would presume it could be that, or it could be the fact that the shoe was worn after the shoe impression was made, and therefore it changed.

* * *

If you have the correspondence of individual characteristics that are present on both, then you have to assume that the areas, the one little nick or something that may not show up on the test print, then that area was possible [sic] distorted after the original impression was made, or there may be dirt or something that was present at the time the shoe print or the test print with the impression on the evidence with the sufficient correspondence of individual characteristics that are present on both that are present and you can see them, then those are identifying marks that enable you to positively identify that shoe.

Q. So, you can't tell us here now whether there is any dissimilar things on the print on the envelope and the shoe print?

A. Well, again, I didn't mark and specifically identify any dissimilarities. There may well be some though."

Further, during cross-examination, the trial judge asked Sherk whether he meant that the second print on

the envelope was smaller because it was a smaller size shoe or just a smaller print because of the way it was on the envelope. Sherk stated it was just a smaller print; to distinguish it from the larger print on the envelope. (Subsequently, during the State's argument in opposition to defendant's motion for a directed verdict, the court stated that the two prints on the envelope were "unexplained.")

Finally, Tana Ramos was called as a defense witness. She stated that on March 9, 1989, she lived at 306 Willard in Joliet, a residence near the burglarized dwelling. She stated that defendant visited her on almost a daily basis. However, she did not know whether defendant visited her on March 9, the date of the burglary.

## STANDARD OF REVIEW

When faced with a challenge to the sufficiency of the evidence, the reviewing court applies the reasonable doubt standard as set forth in *People v. Collins* (1985), 106 Ill. 2d 237, 261. This standard, derived from *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, does not require the court to " 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' " (Emphasis in original.) (*Jackson*, 443 U.S. at 318-19, 61 L. Ed. 2d at 573, 443 S. Ct. at 2789, quoting *Woodby v. Immigration & Naturalization Service* (1966), 385 U.S. 276, 282, 17 L. Ed. 2d 362, 367, 87 S. Ct. 483, 486.) Rather, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Collins*, 106 Ill. 2d at 261; see also *People v. Pintos* (1989), 133 Ill. 2d 286.) This standard is applicable in all criminal cases, regardless of whether the evidence is direct or circumstantial. (*Pintos*, 133 Ill. 2d

at 291; see also *People v. Eyler* (1989), 133 Ill. 2d 173, 191.) The standard gives "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (*Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; see *People v. Young* (1989), 128 Ill. 2d 1, 51.) Therefore, this court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses (*Young*, 128 Ill. 2d at 51), and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt (*Collins*, 106 Ill. 2d at 261).

## DISCUSSION

The elements of the crime of residential burglary are entry into a building without authority, or remaining after authority to enter has been withdrawn, with the intent to commit a felony or theft. (Ill. Rev. Stat. 1987, ch. 38, par. 19—3.) Defendant argues that the appellate court was correct in its finding that the evidence was insufficient to convict him. While he acknowledges that the standard of review is the reasonable doubt test, he contends that the evidence in this case was particularly problematic because of the shoeprint expert's testimony. Defendant urges that there are "general" and "specific" problems with shoeprint identification evidence which support affirmance of the appellate court decision.

As a preliminary matter, we note that our research has revealed no recent Illinois case which addresses whether shoeprint evidence, standing alone, is sufficient to convict. However, in *Carlton v. People* (1894), 150 Ill. 181, 187, quoting Wharton's Criminal Evidence §796 (8th ed.), the court stated: "The evidence of the footprints and their correspondence with the defendant's

feet was competent, and, though 'not by itself of any independent strength, is admissible with other proof as tending to make out a case.' " See also *Gilbreath v. State* (1953), 158 Tex. Crim. 616, 617, 259 S.W.2d 223, 224 ("ordinarily, identity of an accused may not be established alone by tracks"); see also *Ennox v. State* (1936), 130 Tex. Crim. 328, 94 S.W.2d 473.

We note the antiquity of *Carlton* and the quoted language therein from Wharton's. Wharton's is now in its 14th edition. We have reviewed the materials on footprints in the 14th edition and, noticeably, the quoted language in *Carlton* is absent. (1 C. Torcia, Wharton's Criminal Evidence §132, at 547 (14th ed. 1985).) We perceive its absence to be a reflection of a change in position corresponding to the evolution and vast developments in the areas of criminal law and evidence.

## "General Problems"

As a "general problem," defendant first argues that the strength of the expert's opinion on the similarity between the shoe and the test print is subject to doubt because, unlike fingerprint, bitemark or ballistics evidence, shoeprints lack original uniqueness and their characteristics change over a period of time. These problems, defendant maintains, lead to a general distrust of shoeprint evidence.

By his argument, defendant appears to seek a finding that shoeprint evidence is unreliable, as a matter of law. We decline to so find. We believe that where there are significant general and individual characteristics, such as would provide a basis for a positive identification, shoeprint evidence may be as reliable and as trustworthy as any other evidence. Indeed, our review of the relevant case law lends no support to defendant's argument that shoeprint evidence is "generally distrusted." We note that in Illinois, correspondence of footprints found at the

scene of a crime with the sole of one accused of the crime has long been admissible as competent evidence in an attempt to identify the accused as the guilty person. (See, *e.g., Schoolcraft v. People* (1886), 117 Ill. 271; *Carlton v. People* (1894), 150 Ill. 181; *People v. Zammuto* (1917), 280 Ill. 225; *People v. Hanson* (1964), 31 Ill. 2d 31; *People v. Diaz* (1988), 169 Ill. App. 3d 66; *People v. Henne* (1988), 165 Ill. App. 3d 315; *People v. Howard* (1985), 130 Ill. App. 3d 967; *People v. Ricketts* (1982), 109 Ill. App. 3d 992; *People v. Lomas* (1981), 92 Ill. App. 3d 957; *People v. Robbins* (1974), 21 Ill. App. 3d 317; *People v. Kozlowski* (1968), 95 Ill. App. 2d 464; see also 1 C. Torcia, Wharton's Criminal Evidence §132, at 547-54 (14th ed. 1985); Annot., 35 A.L.R.2d 856 (1954).) It simply does not follow that since, as defendant concludes, shoeprint evidence lacks the "original uniqueness" of certain other types of demonstrative evidence it is untrustworthy.

Defendant further attempts to support his untrustworthiness argument with reliance upon *People v. Zismer* (1969), 275 Cal. App. 2d 660, 665, 80 Cal. Rptr. 184, 188, which cites 2 J. Wigmore, Evidence §415 (Chadbourn rev. ed. 1979). He asserts, quoting Wigmore, that the identity inference to be drawn in shoeprint comparison is " 'apt to be especially weak' " because of the lack of uniqueness in shoe features.

Defendant neglects to permit us the full benefit of Professor Wigmore's wisdom on this subject. Wigmore, in concluding his discussion about the weakness of such evidence, states:

> "This is because the features usually taken as the basis of inference—size, depth, contour, etc.—may not be distinctive and fixed in type for every individual, but may apply, even in combination, to many individuals. Hence their probative significance is apt to be small. *** No doubt a witness to identity of footmarks should be required to

specify the features on which he bases his judgment of identity; and then the strength of the inference should depend on the degree of accurate detail to be ascribed to each feature and of the unique distinctiveness to be predicated of the total combination. Testimony not based on such data of appreciable significance should be given no weight." 2 J. Wigmore, Evidence §415, at 488-89 (Chadbourn rev. ed. 1979).

See also *Zismer*, 275 Cal. App. 2d at 665-68, 80 Cal. Rptr. at 188-90.

We would acknowledge that "general problems" with the probative value of shoeprint evidence may arise in a particular case where an attempt is made at positive identification of an accused in the absence of sufficient unique, distinctive characteristics. However, we find no "general problems" with shoeprint evidence such as would support a conclusion of unreliability as a matter of law.

## "Specific Problems"

Defendant next contends that there are "specific problems" with the shoeprint evidence in this case. He first points to the fact that defendant's shoe was a low-cut, white Nike-brand tennis shoe. These features, he maintains, made it merely a common shoe.

We note that since most shoes today have been mass produced, and identical shoes may be sold to many people, new shoes generally differ very little from one to another. Therefore, pattern and other general characteristics, alone, are seldom sufficient for identification purposes. (43 Proof of Facts 2d §1, at 225 (1985). See *Hutt v. State* (1987), 70 Md. App. 711, 523 A.2d 643.) However, when shoes are worn, even for a limited period of time, the soles begin to show peculiar signs of wear, nail marks, cuts, and other accidental markings. Consequently, shoeprints may offer sufficient individual, unique

markings and characteristics upon which to base a positive identification. 43 Proof of Facts 2d §1, at 225 (1985).

In this case, Sherk testified not only to the general pattern and size of the shoe, but also to "peculiar signs of wear." Thus, the evidence in this case does not suffer for lack of evidence of peculiarities. See, *e.g.*, *Casel v. State* (Tex. Crim. App. 1980), 605 S.W.2d 609 (no special characteristics or peculiarities in footprints and shoes to authorize conclusion that footprints could have been made only by shoes in question); see also *Abrams v. Commonwealth* (Ky. 1951), 243 S.W.2d 902; *Thomas v. State* (1945), 148 Tex. Crim. 526, 535, 189 S.W.2d 621, 625; *State v. Sigman* (1935), 220 Iowa 146, 261 N.W. 538.

Defendant next argues that questions are raised by the police officers' three-day delay in securing defendant's shoe. He maintains that the delay created "special problems" with the shoeprint comparison in two ways. First, the delay created a greater possibility that the defendant had recently acquired the shoes. Where the shoes are secured very soon after the incident, defendant asserts, "it can be said with some confidence that the defendant had them at the time" the offense was committed.

We note that shoeprint evidence is circumstantial. "Circumstantial evidence is the proof of facts or circumstances which gives rise to a reasonable inference of other facts which tend to establish the guilt or innocence of a defendant." (*People v. Jones* (1985), 105 Ill. 2d 342, 355; *People v. Rhodes* (1981), 85 Ill. 2d 241, 249.) Circumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged. See *People v. Brown* (1963), 27 Ill. 2d 23.

"It is not necessary, however, that the jury be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all the evidence taken together satisfies the jury beyond a reasonable doubt of the accused's guilt." (*Jones*, 105 Ill. 2d at 350, citing *People v. Foster* (1979), 76 Ill. 2d 365, 374.) Further, in weighing evidence, the trier of fact is not required to disregard inferences which flow normally from evidence before it (*People v. Kelley* (1963), 29 Ill. 2d 53, 59), nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt (*Rhodes*, 85 Ill. 2d at 249).

At defendant's trial, Officer Fonck testified that he retrieved the shoe from defendant while defendant was at the Joliet police station. Admittedly, the trial court was not required to infer from this evidence that defendant owned and had exclusive possession over the shoe. However, no contradictory circumstances to rebut the inference of exclusive and continuous ownership having been offered, we believe such an inference to have been reasonable. Further, where the evidence presented is capable of producing conflicting inferences, the matter is best left to the trier of fact for proper resolution. (See *Publication Corp. v. Chicago River & Indiana R.R. Co.* (1977), 49 Ill. App. 3d 508, 514.) The following cases are helpful on the ownership issue: *People v. Robbins* (1974), 21 Ill. App. 3d 317, 324 (reviewing court stated defendant's argument that there was no testimony that would give rise to an inference that defendant owned the boots overlooked undisputed fact that defendant was wearing the boots when arrested); see also *Harrott v. State* (1931), 116 Tex. Crim. 536, 34 S.W.2d 270 (fact that there was no showing that defendant wore shoes used for comparison on date of homicide went to weight of evidence); *cf. Thomas v. State* (1945), 148 Tex. Crim. 526, 536, 189 S.W.2d 621, 626 (where defendant did not

own shoes which made tracks and provided evidence of alibi, court stated, conceding that tracks were shown to have been made by defendant, that there remained no proof that defendant was wearer of shoes when tracks were made).

Defendant invites our attention to *State v. Larose* (1980), 138 Vt. 281, 415 A.2d 210, and *State v. Palmer* (1949), 230 N.C. 205, 52 S.E.2d 908, in support of his argument that shoeprint identification fails if it cannot be shown that a defendant had the shoes at the time of the offense. We note that *Larose* has been overruled by *State v. Derouchie* (1981), 140 Vt. 437, 440 A.2d 146.

Additionally, we do not read *People v. Palmer* (1949), 230 N.C. 673, 52 S.E.2d 908, as standing for the proposition which defendant asserts. Rather, as explained in a later case, *State v. Jackson* (1981), 302 N.C. 101, 107, 273 S.E.2d 666, 671, proof that the crime in *Palmer* was committed was solely circumstantial. The evidence tending to identify the defendants as the perpetrators was shoeprints and automobile tracks found near the victim's body and evidence of a possible motive. The shoe evidence provided no connection between the shoeprints and the crime itself or those persons accused of the crime. In dealing with the shoeprint evidence, the court in *Palmer* stated that "evidence of shoeprints has no legitimate or logical tendency to identify an accused as the perpetrator of a crime unless the attendant circumstances support this triple *inference*: (1) That the shoeprints were found at or near the place of the crime; (2) that the shoeprints were made at the time of the crime; and (3) that the shoeprints correspond to shoes worn by the accused at the time of the crime." (Emphasis added.) (*Palmer*, 230 N.C. at 213, 52 S.E.2d at 913.) These three circumstances, enumerated in *Palmer*, test the weight to be given shoeprint evidence.

As we have stated, on this evidence, we believe the trial court could properly have inferred that defendant here owned and was in exclusive possession of the shoes.

The second problem caused by the delay, defendant asserts, is that those individual characteristics identified by Sherk could have "coincidentally arose *after* the date of the incident and were not there at all on March 9."

We are not persuaded by this argument. We find it unlikely, as apparently did the trial court, that the six similar individual characteristics could all be the result of coincidence. Were there only one similar characteristic, we would be more inclined to accept this argument. However, we believe that even one individual characteristic, depending on the nature and uniqueness, could be enough for a valid comparison.

Defendant urges another point on the issue of coincidence as it relates to the lack of evidence of dissimilarities. He states that the expert "ignored" dissimilarities, explaining that any dissimilarity would be attributable to wear upon or injury to the shoe occurring after the test print had been impressed. Defendant argues that if subsequent wear caused dissimilarities, it is reasonable that the same wear attributed to "coincidental" similarities. He further maintains that since the expert "ignored" the dissimilarities, the appellate court properly discounted his comparison.

While the expert's testimony regarding dissimilarities lacked clarity on the issue, we are not prepared to state, based on the whole of his testimony, that he "ignored" any dissimilarities. Further, we are mindful that conflicts and inconsistencies in testimony are properly for the trial court to resolve.

We note, incidentally, that in shoeprint comparison, the first step in the analysis is to note any fundamental differences between the shoe and the shoeprint. A fundamental difference is one such as size, shape, or make,

that precludes any further comparison. Absent fundamental differences, points of similarity are located and recorded. Explainable dissimilarities are differences between the shoe and the shoeprint which may have resulted from dust or dirt. 43 Proof of Facts 2d §7, at 237-38 (1985).

We are not persuaded that the lack of evidence of dissimilarities here rendered the shoeprint evidence unreliable. While points of dissimilarity may affect the results of a comparison, they do not necessarily invalidate an identification. The lack of evidence of dissimilarities goes to the weight of the evidence. The value of that evidence is determined by the trier of fact, which has the opportunity to view it.

Defendant next attempts to analogize fingerprint evidence to shoeprint evidence. He points out that fingerprint analysis depends upon similarities, and that a dissimilarity between a test print and a defendant's fingerprint defeats an identification. It would seem, defendant opines, that the same should be true as to the "far less precise science" of shoeprint analysis.

Defendant's argument is flawed. Presumably, fingerprints do not essentially change and no two fingerprints are the same. (*United States v. Buck* (10th Cir. 1971), 449 F.2d 262, 276.) Shoeprints, as defendant concedes, do change. Thus, while a dissimilarity in a fingerprint may not be subject to explanation, such is not the case with shoeprint evidence. See *People v. Lomas* (1981), 92 Ill. App. 3d 957 (trial court, in rendering decision, made certain findings regarding dissimilarity of markings made by right shoe; specifically, judge suggested that elongated gouge which showed up in some of test prints but in none of original prints was of recent origin and may have been made after defendant's arrest).

Defendant next contends that an additional "specific problem" with the shoeprint evidence in this case is that

proof of only six similarities was presented. This, defendant asserts, is "very weak." He maintains that items having only a few similarities may be the product of coincidence, and that the expert must establish enough similarities to overcome that coincidence and give substance to his opinion. He maintains, citing to A. Moenssens, Scientific Evidence in Criminal Cases §7.08, at 433-34 (3d ed. 1986), that fingerprint examiners in the United States demand 8 to 10 points of similarity.

Our research has revealed no Illinois cases which expressly state a requisite number of points of similarity for either shoeprint or fingerprint evidence to be sufficient. We note only incidentally that in *People v. Cheek* (1982), 93 Ill. 2d 82, 93, the detective testified that he found 10 points of similarity between two fingerprints and in *People v. Reno* (1975), 32 Ill. App. 3d 754, 757, the fingerprint technician testified that he found 20 different points of identical comparison. We note further that fingerprint evidence of identity has been held admissible in some cases where the expert found five points of similarity, and in another in which the expert found only four. The courts, in those cases, took the position that the paucity of points of similarity went to the weight accorded to the evidence. See 36 Proof of Facts 2d §4, at 298 (1983) (and cases cited therein).

While we agree with defendant that the greater number of similarities, the stronger the evidence (see, *e.g.*, *People v. Collins* (1953), 117 Cal. App. 2d 175, 255 P.2d 59 (20 points of similarity between palm print on windowsill and accused's print were conclusive of identity), we decline to arbitrarily assign a number for purposes of determining sufficiency. We believe that the problems inherent in doing so are apparent. We hold that the number of similarities found between a test print and the defendant's shoe goes to the weight of the evi-

dence and, thus, whether there is a sufficient number to make a positive identification is a question for the jury.

Defendant's reliance on *People v. Thomas* (1977), 47 Ill. App. 3d 402, is misplaced. There the "criminalist" testified that based on the similar class characteristics and some individual characteristics, it was his opinion that the defendant's shoe probably produced the shoe-print. His opinion was based on the word "Florsheim," two intersecting lines, two pit marks and the width of the shoe. However, the appellate opinion states, the "criminalist" testified that "there were insufficient individual characteristics for a positive identification to be made."

Clearly the word "Florsheim" and the width of the defendant's shoe in *Thomas* were general characteristics. However, it is not clear from the opinion whether the intersecting lines and the pit marks constituted individual or general characteristics. Assuming they were not general, they amounted to two individual characteristics. Whatever the number, the "criminalist" testified that it was insufficient for a positive identification.

Contrarily, in this case, Sherk testified that the six individual characteristics were a sufficient number upon which to base a positive identification. *Cf. State v. Pinyatello* (1968), 272 N.C. 312, 158 S.E.2d 596 (expert testified that he identified between 20 and 25 points that were built into the shoe, no points of dissimilarity, and 11 different identifying points or marks that were not built into the shoe heel); see also *Giacona v. State* (1933), 124 Tex. Crim. 141, 62 S.W.2d 986 (21 points of similarity observed); *People v. Henne* (1988), 165 Ill. App. 3d 315 (facts that boot could not be positively identified as boot which made prints and that measurements of boot made in court differed from prints were held to be factors to be considered by jury in determining what weight, if any, to give evidence).

Finally, defendant contends that in order to connect the defendant with the offense, as with fingerprint evidence, there must be proof that the shoeprint was made at the time the offense was committed. He argues that while Miller could testify that the envelope was on the table when he left the house, Miller did not testify that the shoeprint was not there prior to the burglary. He maintains that the "dearth" of evidence regarding the freshness of the print on the envelope leads to questions about whether the print was made during the burglary. In contrast to this case, defendant cites *State v. Austin* (La. 1981), 399 So. 2d 158 (*overruled in State v. Graham* (La. 1982), 422 So. 2d 123), where the victim specifically testified that the test print was not present prior to the offense. The State has not specifically responded to defendant's argument.

Initially, we note that a foundational requirement often asserted for the admissibility of a print is that the print found at the crime scene must be shown to have been made at or near the time the crime was committed. This requirement may be satisfied with testimony that the footprints appeared fresh or were recently made in view of the weather conditions. 43 Proof of Facts 2d §3, at 229 (1985).

We believe that any attack on the evidence on this basis would have been more appropriate at the stage in the trial when it was offered into evidence. However, our review of the record reveals that defendant made no objection to its admissibility.

That notwithstanding, defendant is correct in his assertion that in order to sustain a conviction solely on fingerprint evidence, fingerprints corresponding to those of the defendant must have been found in the immediate vicinity of the crime under such circumstances as to establish beyond a reasonable doubt that they were impressed at the time the crime was committed. (*People v. Rhodes*

(1981), 85 Ill. 2d 241, 249; *People v. Gomez* (1991), 215 Ill. App. 3d 208, 216.) Further, we agree with defendant that the same time/placement requirement should exist for shoeprint evidence. However, in either case, the State is not required to seek out and negate every conceivable possibility that the print was impressed at some time other than during the commission of the offense. See *Rhodes*, 85 Ill. 2d at 249.

In some cases, evidence of the particular location of the fingerprint satisfies the time/placement requirement, as does the prosecution's proof of the chain of contact of the touched item, which would show that the item could have been touched only at the time of the crime. (*People v. Donahue* (1977), 50 Ill. App. 3d 392, 394.) Additionally, attendant circumstances may well support an inference that the print was made at the time of the commission of the offense. See *People v. Taylor* (1965), 32 Ill. 2d 165 (defendant's fingerprints on inside of window sash in apartment of rape and burglary victim sufficient evidence to establish guilt, since presence of defendant's prints unexplained); *People v. Reno* (1975), 32 Ill. App. 3d 754 (unexplained presence of defendant's thumbprint on package of cigarettes found in purse which had been stolen from residence of murder, standing alone, was sufficient evidence to support conviction of murder).

We believe that there are sufficient attendant circumstances here to support the inference that the shoeprint was made at the time the offense was committed. Miller testified that when he and Buchanan left the house for work, the Illinois Bell envelope was on the kitchen table. He gave no permission to anyone to enter the house during his absence. Upon his returning home, the envelope was on the floor. Sherk testified that the shoeprint on the Illinois Bell envelope shared sufficient similar individual characteristics with shoes in the possession of the defendant for him to make a positive identification. This

evidence, while not conclusive on the issue of when the print was impressed, has some tendency to establish that the defendant was at the scene of the crime, and further that the impression was made at the time the offense was committed. *Cf. People v. Donahue* (1977), 50 Ill. App. 3d 392 (where evidence that defendant had been in victim's apartment some time prior to murder, and State did not rule out possibility that fingerprint could have been impressed at time other than when crime was committed, fingerprint evidence was insufficient to convict); see *State v. Pinyatello* (1968), 272 N.C. 312, 158 S.E.2d 596 (expert's testimony regarding shoeprint evidence would permit jury to reasonably infer from his testimony that heel print on letter corresponded to a shoe worn by accused at time of commission of crime).

## Flight and Opportunity

In further support of its argument that the evidence was sufficient to convict, the State points out that, in addition to the shoeprint evidence, there was evidence of flight, as well as evidence that defendant had opportunity to commit the burglary. At oral argument, defendant argued to the effect that such evidence was weak.

While flight by itself is not sufficient to establish guilt, it may be a circumstance to be considered with other factors tending to establish guilt. (*People v. Brown* (1963), 27 Ill. 2d 23, 26; *People v. Harris* (1972), 52 Ill. 2d 558, 561; 1 C. Torcia, Wharton's Criminal Evidence §214, at 449 (13th ed. 1972).) This evidence, along with the shoeprint evidence and evidence of opportunity, could properly have been considered as tending to establish defendant as the perpetrator of the charged offense. Again, we note that the weight to be given all the evidence was for the trier of fact to determine.

## CONCLUSION

The trial court made a reasoned decision based upon all of the evidence presented at trial. The court properly weighed the evidence, giving full cognizance to its infirmities and the inferences to be drawn therefrom. While we might have weighed the evidence differently, we have neither the authority nor the duty to substitute our judgment. The evidence here, while not of the strongest caliber, does not seem to us so unreasonable as to support a reversal of defendant's conviction for residential burglary.

For the foregoing reasons, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE HEIPLE took no part in the consideration or decision of this case.