STATE OF NORTH CAROLINA v. RUSSELL HOLDEN, JR.

No. 460A91

(Filed 9 December 1994)

**1. Criminal Law § 682 (NCI4th)— capital sentencing—emotional disturbance mitigating circumstance—uncontroverted evidence—refusal to give peremptory instruction—prejudicial error**

The trial court erred by refusing to peremptorily instruct the jury on the statutory mental or emotional disturbance mitigating circumstance in a capital sentencing proceeding where defendant presented the testimony of four expert witnesses in support of this mitigating circumstance and the State presented no evidence that controverted this testimony. Furthermore, this error cannot

**STATE v. HOLDEN**

[338 N.C. 394 (1994)]

be held to be harmless beyond a reasonable doubt, and a defendant sentenced to death is entitled to a new sentencing hearing, where one or more jurors found that this circumstance existed but it is not known how many jurors so found; it is possible that more or all jurors would have found the existence of this circumstance had the peremptory instruction been given; and it is reasonably possible that the number of circumstances found by each juror could have had an effect on the juror's balancing of the mitigating circumstances against the aggravating circumstances, thereby affecting the sentencing recommendation. N.C.G.S. § 15A-2000(f)(2).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

2. **Criminal Law § 1337 (NCI4th)— capital sentencing — felony involving use or threat of violence—attempted second-degree rape—proof by judgment—no non-violent rape or attempted rape in this state**

Evidence of defendant's prior conviction for attempted second-degree rape consisting solely of the judgment against the defendant for that offense satisfies the State's burden of proving the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance that the defendant had previously been convicted of a felony "involving the use or threat of violence to the person." Even if defendant's prior conviction could have been for having sexual intercourse with a person who was mentally defective, mentally incapacitated, or physically helpless as prohibited by N.C.G.S. § 14-27.3(a)(2), additional evidence that violence or a threat of violence accompanied defendant's prior offense was not required because there is no "non-violent" rape or attempted rape under North Carolina law since (1) the force inherent to having sexual intercourse with a mentally defective or incapacitated person who is statutorily deemed incapable of consenting amounts to "violence" as contemplated by this aggravating circumstance, and the attempt to have sexual intercourse with such a person inherently includes a threat of force sufficient to amount to a "threat of violence" within the meaning of this circumstance; and (2) the statute was intended to prohibit having or attempting to have sexual intercourse with a physically handicapped person only when that person does not consent thereto, and such nonconsensual

STATE v. HOLDEN

[338 N.C. 394 (1994)]

acts inherently include force or a threat of force sufficient to rise to the level of "the use or threat of violence" contemplated by this aggravating circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

3. **Criminal Law § 1362 (NCI4th)— capital sentencing— defendant's age as mitigating circumstance—proof of low mental age**

The trial court erred by failing to submit to the jury in a capital sentencing proceeding the statutory mitigating circumstance of the defendant's age at the time of the crime where defendant was thirty-nine years old at the time of the offense, and defendant presented the testimony of a clinical psychologist that defendant's mental age was ten years and that his problem-solving skills were closer to those of a ten-year old than to those of a person in his thirties. N.C.G.S. § 15A-2000(f)(7).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

Justice WHICHARD concurring in the result.

Justice MEYER dissenting.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Bowen, J., at the 30 September 1991 Criminal Session of Superior Court, Duplin County, on a prior jury verdict finding the defendant guilty of first-degree murder. Heard in the Supreme Court on 13 April 1994.

*Michael F. Easley, Attorney General, by William N. Farrell, Jr., Senior Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Marshall Dayan, Assistant Appellate Defender, for the defendant-appellant.*

STATE v. HOLDEN

[338 N.C. 394 (1994)]

MITCHELL, Justice.

The defendant was indicted on 1 July 1985 for one count of murder and one count of first-degree rape. In August 1985, he was tried capitally and found guilty of the first-degree murder of and attempted first-degree rape of Vanessa Jones. He was sentenced to death for the murder and to twenty years imprisonment for the attempted rape. We found no error in the trial and sentences in *State v. Holden*, 321 N.C. 125, 362 S.E.2d 513 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988) (hereinafter *Holden I*).

In 1989, the defendant filed a Motion for Appropriate Relief in the Superior Court, Duplin County. In December 1990, that court granted partial relief by vacating the defendant's death sentence and ordering a new capital sentencing proceeding based on the opinion of the Supreme Court of the United States in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369, *on remand*, 327 N.C. 31, 394 S.E.2d 426 (1990). At the second capital sentencing proceeding, which is the subject of this appeal, the jury found three aggravating circumstances: that the defendant previously had been convicted of a felony involving the use of violence to the person; that the murder was committed for the purpose of avoiding a lawful arrest; and that the murder was committed while the defendant was attempting to commit a rape. The jury found as a mitigating circumstance that the defendant was under the influence of a mental or emotional disturbance when he committed the murder. It then found that the mitigating circumstance did not outweigh the aggravating circumstances and recommended a sentence of death. The trial court sentenced the defendant to death in accord with that recommendation.

The evidence presented during the defendant's original trial and capital sentencing proceeding is summarized in *Holden I*, 321 N.C. at 131-32, 362 S.E.2d at 519-20. The issues presented by this appeal relate only to the defendant's second capital sentencing proceeding.

The State presented evidence at the second capital sentencing proceeding tending to show that in the late evening of 15 March 1985 or the early morning of 16 March 1985, the defendant was seen sitting in his car outside a disco near Warsaw, North Carolina. At approximately 3:00 a.m., four acquaintances asked him for a ride home. The defendant asked one of them, Johnnie Lee Williams, to find Vanessa Jones, but Williams could not locate her. Williams' prior testimony during the defendant's 1985 trial was admitted during this sentencing proceeding because Williams had died subsequent to that trial. The

defendant drove Williams and two others to Williams' home, and they all got out of the car. The defendant and Levon Hicks, who was also in the car at the time, then drove away. Williams stated that he had seen the defendant with a .25 caliber pistol in November 1984 and that the defendant had told him that to keep her from talking, he was going to kill the next girl whom he raped.

Levon Hicks testified that he had known the defendant for seven or eight years and that he knew Vanessa Jones. He saw the defendant sitting in his car outside the disco on 15 March 1985. Hicks got in the defendant's car. Later he saw Johnny Pat Barden and Vanessa Jones walking down the street. Barden asked the defendant to take the two of them home. The defendant agreed, and the four left with the defendant and Hicks in the front seat and Barden and Jones in the back seat.

Hicks further testified that the defendant drove past Jones' house and that Jones complained that she wanted to go home. The defendant instead drove to Barden's home. Hicks stated that shortly after they took Barden home, the defendant stopped the car beside the road and told Hicks to get in the back seat. Jones was passed out at this time. Hicks testified that the defendant ordered him to tie some suspenders around Jones' legs, but Hicks refused.

They then drove on a dirt road and through a little path. Hicks stated that the defendant stopped the car, got in the back seat, and began touching Jones' chest. Hicks was outside the car at the time. He testified that the defendant was unzipping Jones' pants and saying he was going to "get some," but was scared she was going to yell. After twenty minutes the defendant got in the front seat and drove back toward the Warsaw Block Plant. Hicks stated that the defendant told him he was taking him home and that the defendant was going to "get some meat." The defendant asked Hicks if he wanted any "meat," and Hicks declined. The defendant stated that after he "got some meat," he would probably have to kill her so she would not talk. After leaving Hicks at his home, the defendant drove off in the direction of a graveyard.

Henry Sutton discovered the body of Vanessa Jones on a dirt path outside Warsaw. A deputy arrived and identified the body. He noticed a laceration and blood on the victim's body. He also noticed that the victim's shirt was not tucked into her pants, that her pants were unbuckled or unzipped, and that one of her shoes was removed. He radioed for the SBI, secured the scene, and covered the body.

## STATE v. HOLDEN

[338 N.C. 394 (1994)]

Officers executed a search warrant for the house where the defendant lived. They were looking for a knife, but during the search one of the officers saw a pistol behind the bed. The officer did not seize the weapon because at that time it was not known that Jones had been shot.

Later the same day, an SBI special agent who had observed the body executed a search warrant on the residence and seized a knife, a pair of scissors, a pair of wet jeans found in a washing machine, and another knife found in a car parked in the yard. From another car parked in the yard, the agent seized a red suspender similar to one found near Jones' body.

After the autopsy revealed that Jones had been shot in addition to her throat having been cut, the SBI agent returned to the scene of the crime and seized a spent cartridge and two unfired bullets. A deputy returned to the defendant's home to seize the gun, but it was no longer there.

SBI Agent John Payne testified that on 16 March 1985, he saw the defendant in front of his residence. He read the defendant his *Miranda* rights, which the defendant waived. The defendant then said he wanted to speak with Payne about Jones' death. The defendant wrote a statement detailing the events on the night of the murder. The defendant also had an interview with Payne in which he stated that he had been fishing with Williams and the defendant's father on the morning of 16 March 1985 and that upon returning he learned of Jones' death.

A pathologist who performed the autopsy testified that Jones died of a gunshot wound to the throat. He found no semen in her vagina. A forensic witness testified that the shell casings found at the scene matched the defendant's gun, which had been retrieved by officers.

The defendant presented the following evidence pertinent to this appeal:

Dr. George Baroff, a clinical psychology professor at the University of North Carolina at Chapel Hill, was accepted by the trial court as an expert in the field of clinical psychology. He examined the defendant on three occasions and reviewed his school records and a Dorothea Dix Hospital evaluation of the defendant. He administered the Stanford-Binet intelligence test to the defendant, who scored a 56. Such a score falls within the mentally retarded range of intellectual

functioning. In Dr. Baroff's opinion, the defendant was functioning in the mentally retarded range on the date of the offense, even though an I.Q. test showed the defendant's I.Q. to be 70. He testified that a score of 56 was consistent with other scores achieved by the defendant on other intelligence tests. Dr. Baroff further stated that the defendant had a mental age of ten years. He gave the defendant reading material that a seven-year-old could read without difficulty, but the defendant had difficulty reading it. Dr. Baroff also stated that mental retardation adversely affects a person's capacity to think about the consequences of his or her behavior because the person has a difficult time understanding "what might be" as opposed to "what is." Such persons have almost no grasp of the future consequences of actions taken in the present. In Dr. Baroff's opinion, the defendant was under the influence of a mental or emotional disturbance at the time of the offense.

On cross-examination Dr. Baroff stated that the pattern of the defendant's responses on the tests suggested that he was not malingering by performing poorly on purpose. Dr. Baroff also conceded that though the defendant's mental age was nine or ten years, his life experience was greater than that of a ten-year old. He further stated that the defendant was married, operated a vehicle, and had held a job at a poultry factory for ten or twelve years. The defendant had been promoted to assistant manager at the factory. The defendant also had volunteered with a rescue squad but was unable to pass the exam to become a certified Emergency Medical Technician.

Willie Arnette, a friend of the defendant and his co-worker on the rescue squad, testified that the rescue squad is a volunteer organization which met twice a month. He stated that the defendant and he were on the squad for four years.

Dr. Thomas Ryan, a clinical neuropsychologist, was accepted by the trial court as an expert in the field of neuropsychology. He conducted neuropsychological assessments on the defendant on 5 August 1989 for nine hours. Based on tests taken by the defendant and on medical records, Dr. Ryan determined that the defendant suffered from moderate brain damage, which had resulted from a lack of oxygen at the time of the defendant's birth. He found the defendant's intellectual functioning to be in the mentally retarded range, and he also concluded that the defendant was not malingering on the tests. Dr. Ryan further stated that the defendant's scores indicated that he was severely impaired by his brain damage. He testified that the

impairments were present at the time of the offense, and that at the time of the offense the defendant's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

Dr. Nancy Earl, a physician, was accepted by the court as an expert in the field of neurology. She testified that she was familiar with the neuropsychological testing performed on the defendant and had reviewed Dr. Ryan's report. She also had reviewed the defendant's birth records as well as his mother's medical records. She stated that the defendant's neurological impairment could have been caused in part by a lack of oxygen to the brain during his birth. She performed a neurologic exam on the defendant on 4 August 1989 for three hours. Dr. Earl found the defendant to be alert and oriented; he knew who he was, he knew the date, and he understood that she was a doctor.

The mental status examination revealed global impairments, which indicated that both the sides and frontal area of the brain were impaired. The physical examination revealed that the defendant had some abnormal features in his eyes and that the muscle tone in his legs was abnormally increased on both sides, which indicated a motor neuron lesion in the brain.

Dr. Earl further found the defendant's reflexes to be abnormally brisk. She stated that the defendant was not malingering; rather, he was trying to cooperate during these tests. She concluded that her findings of brain dysfunction were consistent with mental retardation, poor school performance, and the lack of oxygen to his brain at birth. In her opinion, the defendant was under the influence of a mental or emotional disturbance at the time of the offense. She also opined that at the time of the offense, the defendant's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired.

On cross-examination Dr. Earl testified that she assumed the defendant understood what a gun was and what it meant to pull the trigger of a gun. She also thought the defendant would understand that if he shot a person in the throat with a gun, the person would be hurt. She stated that the defendant probably understood what a knife was and that if he cut a person's throat with a knife, the person would be injured.

Dr. Mark Chandler, an assistant professor and neuropsychiatrist at the University of North Carolina at Chapel Hill, was accepted by the trial court as an expert in the fields of psychiatry, mental retardation, and neuropsychiatry. He had examined the defendant on four different occasions in 1989 and was familiar with the testing performed by Drs. Baroff and Ryan. He concluded that the defendant was mildly mentally retarded and that he did not have any major depressive disorders or psychoses. He further determined that the defendant had organic brain damage and was suffering from a mental or emotional disturbance at the time of the offense. In his opinion, the defendant's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired at the time of the offense. On cross-examination Dr. Chandler stated that the defendant knows what a pistol is, how to pull the trigger, and probably understands that if you shoot someone, the person will be injured.

[1] The defendant first assigns as error the trial court's refusal to peremptorily instruct the jury on mitigating circumstances. The defendant argues *inter alia* in support of this assignment that the evidence supporting the statutory mitigating circumstance that the defendant suffered a mental or emotional disturbance at the time of the murder was uncontroverted. He contends that the trial court therefore should have instructed peremptorily on that mitigating circumstance. N.C.G.S. § 15A-2000(f)(2) (1988). We agree.

The defendant submitted evidence in support of this statutory mitigating circumstance in the form of expert testimony from Dr. George Baroff, a clinical psychologist, Dr. Thomas Ryan, a neuropsychologist, Dr. Mark Chandler, a neuropsychiatry professor, and Dr. Nancy Earl, a neurology professor. Dr. Baroff stated that the defendant's I.Q. is 56, which is in the mentally retarded range. He further stated that the defendant was under a mental or emotional disturbance at the time of the offense. Dr. Ryan testified that the defendant suffered from moderate organic brain damage. Dr. Chandler testified that the defendant was mildly retarded and had organic brain damage. He further stated that the defendant was under a mental or emotional disturbance at the time of the crime. Dr. Earl testified that the defendant's brain damage was caused by complications at his birth.

The State presented no evidence that controverted the defendant's evidence on this mitigating circumstance and does not argue that any such evidence was presented. We have held that "[w]here

. . . all of the evidence in [a capital prosecution], if believed, tends to show that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance." *State v. Johnson*, 298 N.C. 47, 76, 257 S.E.2d 597, 618 (1979). As the evidence supporting the mitigating circumstance found in N.C.G.S. § 15A-2000(f)(2) was uncontroverted, it was error for the trial court to deny the defendant's request for a peremptory instruction thereon. *Cf. State v. Green*, 336 N.C. 142, 172-74, 443 S.E.2d 14, 32 (1994) (peremptory instructions relating to *nonstatutory* mitigating circumstances differ from those relating to *statutory* mitigating circumstances).

We cannot conclude that this error was harmless beyond a reasonable doubt. One or more of the jurors found that this statutory mitigating circumstance existed; however, we do not know whether all of the jurors did. Assuming, as we must, that not all jurors found this mitigating circumstance existed, it is possible that had the peremptory instruction been given, more or all would have done so. *See State v. Gay*, 334 N.C. 467, 492-94, 434 S.E.2d 840, 855 (1993) (determining that failure to instruct peremptorily on uncontroverted, nonstatutory mitigating circumstances could not be held harmless beyond a reasonable doubt because more or all jurors might have found the circumstance if a peremptory instruction had been given). It is reasonably possible that the number of circumstances found by each juror could have had an effect on the juror's balancing of the mitigating circumstances against the aggravating circumstances, thereby affecting the sentencing recommendation. *See id.* Therefore, the defendant is entitled to a new capital sentencing proceeding.

The defendant has brought forward additional assignments of error. Although we need not address those assignments in light of our holding that the defendant is entitled to a new capital sentencing proceeding, the issues presented in some of those assignments are almost certain to arise again in any new capital sentencing proceeding the defendant is subjected to. For that reason, we elect to discuss the following additional assignments of error.

[2] The defendant assigns as error the trial court's submission of the aggravating circumstance that the defendant previously had been convicted of a felony involving the use of violence. N.C.G.S. § 15A-2000(e)(3) (1988). The defendant had been convicted of the felony of attempted second-degree rape against a person other than the victim in the case before us. The court instructed that "attempted

rape is by definition a felony involving the use of violence to the person." The defendant contends that no evidence was presented from which the jury could find beyond a reasonable doubt that the attempted second-degree rape involved violence or the threat of violence. He argues that because the State only offered proof of his conviction for second-degree rape by presenting the judgment, it failed to present evidence sufficient to prove the aggravating circumstance beyond a reasonable doubt. He reasons that the conviction is insufficient to prove the use of or threatened use of violence because second-degree rape may be predicated on sexual intercourse with a person who is mentally defective, mentally incapacitated, or physically helpless. N.C.G.S. § 14-27.3(a)(2) (1993). Thus, according to the defendant, the trial court should not have submitted the circumstance based solely on the judgment entered upon the conviction. We do not agree.

The General Assembly of North Carolina has provided that one aggravating circumstance weighing in favor of a sentence of death is that a defendant "had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3) (1988). The issue in the present case is whether evidence of a defendant's prior conviction for attempted second-degree rape consisting solely of the judgment against the defendant for that offense satisfies the State's burden of proving this aggravating circumstance. We conclude that it does.

Under N.C.G.S. § 15A-2000(e)(3), the required prior felony

can be either one which has as an element the involvement of the use or threat of violence to the person, such as rape or armed robbery, *State v. Hamlette*, 302 N.C. 490, 276 S.E.2d 338 (1981), or a felony which does not have the use or threat of violence to the person as an element, but the use or threat of violence to the person was involved in its commission.

*State v. McDougall*, 308 N.C. 1, 18, 301 S.E.2d 308, 319, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983) (footnote omitted). This Court has concluded that for purposes of N.C.G.S. § 15A-2000(e)(3), rape is a felony which has as an element the use or threat of violence to the person. *State v. Artis*, 325 N.C. 278, 321, 384 S.E.2d 470, 494 (1989) (quoting *McDougall*, 308 N.C. at 18, 301 S.E.2d at 319), *judgment vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604, *on remand*, 327 N.C. 470, 397 S.E.2d 223 (1990)). We have further reasoned that where rape is deemed to have as an element the use or threat of violence, the "felony of attempt to commit rape is therefore

by nature of the crime a felony which threatens violence." *State v. Green*, 336 N.C. 142, 170, 443 S.E.2d 14, 30 (1994) (interpreting military law). Under N.C.G.S. § 15A-2000(e)(3), "[a]ttempting to commit a crime which inherently involves violence obviously constitutes, at least, a 'threat of violence.'" *Id.* at 169, 443 S.E.2d at 30. Therefore, the judgment showing that the defendant had previously been convicted of attempted second-degree rape was sufficient, standing alone, to require that the trial court submit the aggravating circumstance that the defendant had committed a prior felony involving the use or threat of violence to the person.

For purposes of applying this aggravating circumstance, we reject the notion of any felony which may properly be deemed "non-violent rape." We believe that a more enlightened view of this matter has been expressed in the opinions of military courts which have been cited with approval by this Court.

> Under the Uniform Code of Military Justice, rape is always, and under any circumstances, deemed as a matter of law to be a crime of violence. *United States v. Bell*, 25 M.J. 676 (A.C.M.R. 1987), *rev. denied*, 27 M.J. 161 (C.M.A. 1988); *United States v. Myers*, 22 M.J. 649 (A.C.M.R. 1986), *rev. denied*, 23 M.J. 399 (C.M.A. 1987). As stated in *Myers*, military courts "specifically reject the oxymoronic term of 'non-violent rape.' The more enlightened view is that rape is always a crime of violence, no matter what the circumstances of its commission." *Myers*, 22 M.J. at 650. "Among common misconceptions about rape is that it is a sexual act rather than a crime of violence." *United States v. Hammond*, 17 M.J. 218, 220 n.3 (C.M.A. 1984).

*Green*, 336 N.C. at 169, 443 S.E.2d at 30. We conclude, for similar reasons, that the crime of attempted rape always involves at least a "threat of violence" within the meaning of N.C.G.S. § 15A-2000(e)(3).

It is true that *dicta* in *McDougall* supports the existence of both "non-violent" rape and "non-violent" attempted rape under North Carolina law. *McDougall*, 308 N.C. at 18 n.1, 301 S.E.2d at 319 n.1. More recently, however, we have emphasized the fact that such language in *McDougall* was mere *dicta* when we declined to "consider whether there is a non-violent crime of attempted rape under North Carolina law." *Green*, 336 N.C. at 170, 443 S.E.2d at ——. The defendant suggests that his prior conviction for attempted second-degree rape under N.C.G.S. § 14-27.3 could have been for having sexual intercourse with a person who was mentally defective, mentally incapaci-

tated, or physically helpless. N.C.G.S. § 14-27.3(a)(2) (1993). He would therefore have us conclude that it has not been established that violence or a threat of violence accompanied the defendant's prior offense of attempted second-degree rape. We do not agree.

The acts of having or attempting to have sexual intercourse with another person who is mentally defective or incapacitated and statutorily deemed incapable of consenting—just as with a person who refuses to consent—involve the "use or threat of violence to the person" within the meaning of N.C.G.S. § 15A-2000(e)(3). In this context, the force inherent to having sexual intercourse with a person who is deemed by law to be unable to consent is sufficient to amount to "violence" as contemplated by the General Assembly in this statutory aggravating circumstance. Likewise, the attempt to have sexual intercourse with such a person inherently includes a threat of force sufficient to amount to a "threat of violence" within the meaning of this aggravating circumstance.

Nor do we believe that having or attempting to have sexual intercourse with a "physically helpless" person in violation of N.C.G.S. § 14-27.3(a)(2) may properly be deemed "non-violent" rape or attempted rape. We find no merit in the suggestion that N.C.G.S. § 14-27.3(a)(2) makes it a crime to have *consensual* sexual intercourse with a physically helpless person. For purposes of this discussion only, we accept the questionable proposition that the legislature could, consistent with the Constitution of the United States, make consensual sexual intercourse with a physically helpless person a felony. *But cf. Bowers v. Hardwick*, 478 U.S. 186, 92 L. Ed. 2d 140 (rejecting any fundamental right of homosexuals to engage in acts of consensual sodomy, but implying that consensual sex acts between heterosexual adults ordinarily will be viewed as constitutionally protected). Nevertheless, we conclude that the legislature intended no such result and that the statute only prohibits having or attempting to have sexual intercourse with a physically helpless person who does not consent thereto. Such acts of having or attempting to have sexual intercourse with a physically helpless person who does not consent inherently include force or a threat of force sufficient to rise to the level of "the use or threat of violence" contemplated in the aggravating circumstance set forth as N.C.G.S. § 15A-2000(e)(3).

For the foregoing reasons, we conclude that the prior judgment against the defendant for attempted second-degree rape, standing alone, was sufficient evidence to require that the trial court submit

the statutory aggravating circumstance that the defendant previously had been convicted of a felony "involving the use or threat of violence to the person." Therefore, the trial court properly submitted this statutory aggravating circumstance for the jury's consideration during the defendant's capital sentencing proceeding.

[3] The defendant also assigns as error the trial court's failure to submit the statutory mitigating circumstance of the defendant's age at the time of the crime. *See* N.C.G.S. § 15A-2000(f)(7). The defendant was thirty-years-old at the time of the offense. He argues that there was substantial evidence to support the circumstance and that the trial court had to submit it, despite his withdrawal of his request that it be submitted. We conclude that the evidence supported the circumstance, and the trial court erred in failing to submit it to the jury.

In support of this mitigating circumstance, the defendant elicited the testimony of Dr. Baroff, who stated that, based on a series of tests, he had formed the opinion that the defendant's mental age was ten years. He further stated that the defendant performed better on easier parts of the tests than he did on the more difficult parts, which is a pattern consistent with valid and honest responses by a test-taker. Dr. Baroff testified that on the date of the offense the defendant's intellectual functioning was in the mentally retarded range, which was consistent with another I.Q. test that the defendant had taken in 1989. On cross-examination Dr. Baroff conceded that the defendant had more life experience than a ten-year-old child, but on redirect he explained that the defendant's problem-solving skills were closer to those of a ten-year-old than to those of a person who was in his thirties.

We have characterized "age" as a "flexible and relative concept." *State v. Johnson*, 317 N.C. 343, 393, 346 S.E.2d 596, 624 (1986). We also have noted that "the chronological age of a defendant is not the determinative factor under G.S. § 15A-2000(f)(7)." *State v. Oliver*, 309 N.C. 326, 372, 307 S.E.2d 304, 333 (1983). Here, the defendant was thirty-years old at the time of the offense; however, the testimony of Dr. Baroff that the defendant's mental age was ten years and that his problem-solving skills were closer to those of a ten-year-old was substantial evidence from which a juror or jurors reasonably could find that the defendant's age at the time of the offense was mitigating. Therefore, regardless of the defendant's wishes about the matter, the trial court had an independent duty to submit the statutory mitigating circumstance based on the evidence. *See* N.C.G.S. § 15A-2000(b)

(1988); *State v. Brown*, 315 N.C. 40, 62, 337 S.E.2d 808, 824-25 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

For the reasons stated, the defendant is entitled to a new capital sentencing proceeding.

NEW CAPITAL SENTENCING PROCEEDING.

Justice WHICHARD concurring in the result.

I concur in the holding that defendant must have a new capital sentencing proceeding because he was entitled to a peremptory instruction on the mitigating circumstance that he suffered a mental or emotional disturbance at the time of the murder. I also agree that the trial court should have submitted the mitigating circumstance of defendant's age at the time of the crime. I write separately because I disagree with the conclusion that attempted second-degree rape is an inherently violent crime by definition and that therefore evidence of defendant's prior conviction for attempted second-degree rape consisting solely of the judgment entered thereon satisfies the State's burden of proving the aggravating circumstance of the previous conviction of a felony involving the use or threat of violence to the person.

The opinion for the Court correctly states that in *State v. Artis*, 325 N.C. 278, 321, 384 S.E.2d 470, 494 (1989), this Court concluded that rape has as an element the use or threat of violence to the person; however, the opinion fails to note that in *Artis* the Court was considering N.C.G.S. § 14-27.2, which defines the offense of *first-degree* rape. From this Court's determination that first-degree rape necessarily involves the use or threat of violence, the opinion concludes that *second-degree* rape also always involves violence and that therefore attempted second-degree rape involves at least the threat of violence. In light of the plain language of N.C.G.S. § 14-27.3(a)(1) & (2) and the generally accepted meaning of the word "violent," I am unable to make this leap in logic.

The State may proceed on one of two theories in proving second-degree rape as defined in N.C.G.S. § 14-27.3(a)(1) & (2). It may show that the defendant had vaginal intercourse "[b]y force and against the will" of the victim, or it may show that the intercourse was committed against a victim who is "mentally defective, mentally incapacitat-

ed, or physically helpless" and that the defendant knew or should have known of the victim's condition. N.C.G.S. § 14-27.3(a)(1) & (2) (1993). A mentally defective victim may be one "who suffers from mental retardation, or . . . who suffers from a mental disorder, either of which temporarily or permanently renders the victim substantially incapable of appraising the nature of his or her conduct . . . ." *Id.* § 14-27.1(1). A mentally defective person who is substantially incapable of appraising the nature of his or her conduct nonetheless could be willing to participate in sexual intercourse and able to communicate a willingness to do so. Sexual intercourse with such a person could be entirely non-violent, though deemed criminal by the legislature. A physically helpless victim may be one "who is physically unable to resist an act of vaginal intercourse or a sexual act . . . ." *Id.* § 14-27.1(3). A physically helpless person who is physically unable to resist a sexual act nonetheless may be willing to participate in such an act and capable of verbally communicating his or her willingness to do so. Sexual intercourse with a physically helpless person thus could be non-violent, though deemed criminal by the legislature.

The opinion for the Court accepts the possibility that the legislature could deem consensual sexual intercourse with a physically helpless person criminal but concludes that the legislature did not intend that result here. I cannot join in this conclusion. "[P]enal statutes are construed strictly against the State and liberally in favor of the private citizen with all conflicts and inconsistencies resolved in his favor." *State v. Pinyatello*, 272 N.C. 312, 314, 158 S.E.2d 596, 596 (1968). We thus must construe the statute liberally in defendant's favor. Whether constitutionally allowed or not, the legislature has shown itself capable of deeming consensual sexual intercourse criminal in another context: when it occurs between individuals who are not married to each other. *See* N.C.G.S. § 14-184 (1993) ("If any man and woman, not being married to each other, shall lewdly and lasciviously associate, bed and cohabit together, they shall be guilty of a misdemeanor . . . ."). Like N.C.G.S. § 14-184, N.C.G.S. § 14-27.3(a)(2) makes no mention of violence. Given the lack of express language denoting violence, it is similarly possible that the legislature intended second-degree rape to encompass non-violent acts of sexual intercourse with mentally defective or physically helpless persons.

To support the "prior violent felony" aggravating circumstance, the State introduced only the judgment, which stated only that defendant had been convicted of attempted second-degree rape. Without more, there was no proof that the offense in fact involved the

use or threat of violence because the State does not need to prove violence to satisfy the essential elements of second-degree rape involving a physically helpless or mentally defective victim. Defendant's conviction could have been for attempted second-degree rape against a victim who was mentally defective by virtue of his or her inability to appraise the nature of his or her conduct or against one who was physically helpless and unable physically to resist a sexual act. Neither act necessarily involves the use of violence. Rape is generally an abhorrent and serious crime, but the language of the statute allows for the possibility that the crime of attempted second-degree rape may be non-violent—indeed, thoroughly consensual.

The opinion for the Court opines that the legislature only intended to prohibit having or attempting to have nonconsensual sexual intercourse with a physically helpless person, and it questions whether any other view would pass constitutional muster. The problem, however, is that with only the judgment before us, we cannot know whether the intercourse involved in the prior felony was consensual or nonconsensual. I do not believe a death sentence based in part on the "prior violent felony" aggravating circumstance can stand without proof in the record that the felony was in fact violent.

I therefore would hold that the trial court erred in submitting this aggravating circumstance without further proof of a factual basis for the conviction showing that the offense in fact involved the use or threat of violence. If the prosecution has such proof, it should offer it at defendant's new capital sentencing proceeding.

Justice MEYER dissenting.

I do not agree that the failure to give a peremptory instruction on the statutory mitigating circumstance that defendant suffered a mental or emotional disturbance at the time of the murder, N.C.G.S. § 15A-2000(f)(2) (1988), which circumstance the jury actually found, constitutes reversible error requiring a new sentencing proceeding.

It is my position that the majority's reliance on *State v. Gay*, 334 N.C. 467, 492-94, 434 S.E.2d 840, 855 (1993), is misplaced. Though I voted for the opinion in *Gay*, I have since concluded that *Gay* was wrongly decided. Moreover, in this case, we are faced with a *statutory* mitigating circumstance not a *nonstatutory* mitigating circumstance, as was the issue in *Gay*.

**STATE v. HOLDEN**

[338 N.C. 394 (1994)]

It is quite clear that we employed the wrong standard of review in *Gay*. In *Gay*, this Court held that it was error to fail to give a peremptory instruction on a nonstatutory mitigating circumstance. We said in *Gay*:

> In regard to the nonstatutory mitigating circumstances which were found by one or more jurors, we have no way of knowing whether or not they were unanimously found. If one was not unanimously found, it is possible that more jurors, or all the jurors, would have found the circumstance to exist and to have mitigating value had a peremptory instruction been given.

*Id.* at 494, 434 S.E.2d at 855. This Court then held that the defendant was entitled to a new sentencing hearing because the Court was "unable to find the error [failure to give a peremptory instruction on uncontroverted nonstatutory mitigating circumstances] harmless beyond a reasonable doubt." *Id.*

While we have held that it is error to fail to give peremptory instructions where the evidence of mitigating circumstances is uncontroverted, the error is not one of constitutional magnitude warranting the "harmless beyond a reasonable doubt" standard.

The United States Supreme Court has stated:

> "*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all."

*Johnson v. Texas*, —— U.S. ——, ——, 125 L. Ed. 2d 290, 302 (quoting with approval some language from Kennedy, J.'s concurring in judgment opinion in *McKoy v. North Carolina*, 494 U.S. 433, 456, 108 L. Ed. 2d 369, 389 (1990)), *reh'g denied*, —— U.S. ——, 125 L. Ed. 2d 767 (1993). Whether a mitigating circumstance is charged upon peremptorily is not an issue of constitutional dimension because failure to give a peremptory instruction does not preclude in any manner the presentation of mitigating evidence or limit the jury's consideration of such evidence. Where, as here, and as in *Gay* with regard to several nonstatutory circumstances, the jury considered and actually found the mitigating circumstance in question, it is clear that *Lockett* and its progeny have not been violated and that no error of constitutional dimension has occurred.

[338 N.C. 412 (1994)]

Since the failure to give a peremptory instruction is not an issue of constitutional dimension, the appropriate standard for determining whether the trial court's error was prejudicial is whether there is a "reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a) (1988). Further, "[t]he burden of showing such prejudice under this subsection is upon the defendant." *Id.* Applying this standard to the case *sub judice*, defendant has failed to demonstrate that he was prejudiced by the trial court's refusal to give a peremptory instruction on the statutory mitigating circumstance at issue.

In sum, I believe that *State v. Gay* was wrongly decided, that the majority's reliance on *State v. Gay* in this case is thus misplaced, and that the majority erroneously applies a "harmless beyond a reasonable doubt" standard to an error that is not of constitutional dimension. For these reasons, I respectfully dissent.