506 S.E.2d 283 (1998)
STATE of North Carolina
v.
Shelly WASHINGTON.
No. COA97-838.
Court of Appeals of North Carolina.
October 20, 1998.
*285 Attorney General Michael F. Easley by Assistant Attorney General Jane Ammons Gilchrist, for the State.
Appellate Defender Malcolm Ray Hunter, Jr. by Assistant Appellate Defender Mark D. Montgomery, Durham, for defendant.
LEWIS, Judge.
Defendant appeals from his convictions of second-degree rape in violation of N.C. Gen.Stat. § 14-27.3 (1993) and second-degree sexual offense in violation of N.C. Gen.Stat. § 14-27.5 (1993). The State's evidence tended to show that on the evening of 25 December 1994, A.W. was raped by defendant at the residence of A.W.'s mother, Ethel, and sister, Luttrell. Defendant was Ethel's boyfriend. The facts of the case will be described in greater detail in the discussion below.

I. Determination That A.W. Was Incompetent to Testify
Before trial, the State moved to have A.W. declared incompetent to testify. After a hearing, the trial court found that A.W. was not competent to testify because she was "incapable of expressing [herself] concerning the matter as to be understood, either directly or through interpretation by one who can understand [her]." N.C.R. Evid. 601(b). Defendant argues that it was error to grant the motion.
The determination of whether a witness is competent to testify rests within the sound discretion of the trial judge, who has the opportunity to observe the witness firsthand. State v. Fields, 315 N.C. 191, 204, 337 S.E.2d 518, 526 (1985). "Absent a showing that the ruling as to competency could not have been the result of a reasoned decision, the ruling must stand on appeal." State v. Hicks, 319 N.C. 84, 89, 352 S.E.2d 424, 426 (1987).
*286 At the competency hearing, the court received testimony from Dr. Monty Grubb, an expert in the psychology of mentally retarded individuals. Dr. Grubb is a consultant to an organization that provides health care services to A.W. He testified that his job involves reviewing A.W.'s psychological evaluations and providing psychological therapy, that he has been working in this position for a year, and that he is reasonably familiar with A.W.'s medical history. Dr. Grubb stated that over the past year, he had spoken with A.W. at six or seven sessions for ten to thirty minutes per session. He further stated that he has brief contact with A.W. weekly "where we may not exchange words but we see each other."
Dr. Grubb indicated that although A.W. "understands most of simple conversation," she cannot speak in a manner that is easily understood. He testified that A.W.'s cerebral palsy impairs her ability to speak and makes it "very difficult to understand much of what she says."
The only other witness to testify at the competency hearing was A.W. herself. Based on his observation of A.W., the trial judge stated that "the court had a very difficult time understanding what [A.W.] was actually saying in response to the questions."
Based on the evidence presented at the competency hearing, we cannot say that the trial court abused its discretion in ruling that A.W. was incapable of effectively communicating at trial and was therefore incompetent to testify.

II. Hearsay Statements Challenged by Defendant
Defendant next argues that the trial court erred by allowing several witnesses to testify regarding statements made by A.W. about the alleged rape. Defendant argues that because hearsay statements by A.W. were admitted into evidence at trial, and because defendant had no opportunity to cross-examine A.W., his right of confrontation under the Sixth Amendment was violated.
A criminal defendant has the "right ... to be confronted with the witnesses against him." U.S. Const. amend VI. See also N.C. Const. art. I, § 23 (similar). The right of confrontation guaranteed by the Sixth Amendment includes the right to cross-examine adverse witnesses. Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934, 937 (1965). A person is a "witness against" a criminal defendant not only when she testifies at trial, but also when statements of hers that are adverse to the defendant are admitted as hearsay. See White v. Illinois, 502 U.S. 346, 352-53, 112 S.Ct. 736, 740-41, 116 L.Ed.2d 848, 856-57 (1992).
A defendant's right to cross-examine the witnesses against him is not absolute. For example, the admission of hearsay that "come[s] within a firmly rooted exception to the hearsay rule" generally does not violate the defendant's right of confrontation even if the defendant has no opportunity to crossexamine the declarant. Id. at 356, 112 S.Ct. at 743, 116 L.Ed.2d at 859. This is because statements that fall within firmly rooted hearsay exceptions are deemed "so trustworthy that adversarial testing can be expected to add little to [their] reliability." Id. at 357, 112 S.Ct. at 743, 116 L.Ed.2d at 860.
Furthermore, some hearsay that does not fall within a firmly rooted hearsay exception may be admitted without violating the Confrontation Clause. Such hearsay must be marked by "particularized guarantees of trustworthiness." See Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980). Whether such hearsay must also be "necessary" to the prosecution's case is debatable. See id. at 65, 100 S.Ct. at 2538-39, 65 L.Ed.2d at 607 (stating that "the Sixth Amendment establishes a rule of necessity" such that ordinarily, "the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant"); Idaho v. Wright, 497 U.S. 805, 815-16, 110 S.Ct. 3139, 3146-47, 111 L.Ed.2d 638, 652 (1990) (expressly declining to address whether demonstrating a child declarant's unavailability is required to admit the child's statements under the residual hearsay exception); White, 502 U.S. at 354-55, 112 S.Ct. at 741-42, 116 L.Ed.2d at 858-59 (suggesting that a showing of declarant's unavailability is not required even if hearsay does not fall within a *287 firmly rooted hearsay exception). Nevertheless, our state Supreme Court has interpreted the relevant United States Supreme Court opinions as holding that where hearsay does not fall within a firmly rooted exception to the hearsay rule, its admission violates the Confrontation Clause unless the State establishes not only the reliability of the hearsay, but also its necessity. State v. Jackson, 348 N.C. 644, 503 S.E.2d 101, 106 (N.C.1998).
In Jackson, our state Supreme Court also held that it would interpret a criminal defendant's right of confrontation under the North Carolina Constitution by applying the same reasoning of the United States Supreme Court in White v. Illinois, supra, and in United States v. Inadi, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). Specifically, the Jackson Court held that "where hearsay proffered by the prosecution comes within a firmly rooted exception to the hearsay rule, the Confrontation Clause of the North Carolina Constitution is not violated, even though no particularized showing is made as to the necessity for using such hearsay or as to its reliability or trustworthiness." Jackson, 503 S.E.2d at 107. With these principles in mind, we turn to the statements by A.W. that were admitted as hearsay over defendant's objection.

A. Statements to Luttrell and Ethel
A.W.'s sister, Luttrell, testified that on the evening of the alleged rape, she left her mother's house to visit a next-door neighbor, locking the door and leaving A.W. behind. Fifteen to twenty minutes later, A.W. arrived at the neighbor's house. At first, Luttrell could not understand what A.W. was trying to tell her because A.W. was upset and crying. Then A.W. said, "My mama friend, right. Shelton raped me." Luttrell told her to stop lying, but A.W. said, "No. He stuck his d in me." According to Luttrell, when Luttrell brought A.W. back to her mother's house, A.W. told her that Shelton had "kissed her in the mouth" and had given her perfume and fifteen dollars and told her not to tell her sister or mother that he had given her those items. Luttrell stated that A.W. was upset and crying when she said these things.
Luttrell telephoned their mother, Ethel, and told Ethel what A.W. had said. Ethel testified that when she arrived home about five minutes later, A.W. was shaking and crying and "[h]ad a scared look on her face." Ethel testified that A.W. told her what had happened. The account that A.W. gave Ethel was almost exactly what she had told Luttrell. According to Ethel, A.W. was upset and crying and "shaking like a leaf" when she was describing what had occurred.
The trial court held, and we agree, that A.W.'s statements to A.W. and Luttrell were excited utterances, admissible as exceptions to the general rule prohibiting hearsay testimony. See N.C.R. Evid. 803(2). A statement is an excited utterance if it is the result of an "occurrence or event sufficiently startling to render inoperative the normal reflective processes of the observer," and, more specifically, it is "a spontaneous reaction to the occurrence or event and not the result of reflective thought." 2 Kenneth S. Broun et al., McCormick on Evidence § 272 (John William Strong ed., 4th ed.1992); see State v. Smith, 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985). In this case, A.W.'s statements to Luttrell and Ethel explained that she had been raped by Ethel's boyfriend less than thirty minutes before. Both Luttrell and Ethel testified that A.W. was visibly shaken when she made the statements. This testimony, collectively, was sufficient to support the court's ruling.

B. Statements to Officer Fey and Investigator Vincent
Shortly after she arrived home, Ethel dialed 911 and told the operator her daughter had been raped. Officer Fey of the Wilmington Police Department was dispatched at 10:30 p.m. When he arrived about five minutes later, Officer Fey took a statement from A.W. using Ethel as an interpreter. Shortly after 11:00 p.m., Investigator Sharon Vincent of the Wilmington Police Department interviewed A.W. The statements A.W. made to Officer Fey and Investigator Vincent were essentially the same as those she made to Luttrell and Ethel.
Over defendant's objection, the court admitted A.W.'s statements to Officer Fey and *288 Investigator Vincent. The court concluded that these statements fell within the residual exceptions to the hearsay rule, N.C.R. Evid. 803(24) and 804(b)(5), which allow the admission of hearsay not falling within wellestablished hearsay exceptions but "having equivalent circumstantial guarantees of trustworthiness." In ruling these statements admissible, the trial court concluded only that the statements were "trustworthy," and the court made no findings of fact supporting that conclusion.
The trial court failed to make the necessary "findings of fact and conclusions of law that the statement[s] possess[ ] `equivalent circumstantial guarantee[s] of trustworthiness.' " State v. Triplett, 316 N.C. 1, 9, 340 S.E.2d 736, 741 (1986) (quoting Smith, 315 N.C. at 93, 337 S.E.2d at 845). For this reason, it was error to admit the statements of A.W. to Officer Fey and Investigator Vincent.

C. Statements to Nurse Madeiros
Ethel took A.W. to the emergency room at New Hanover Regional Medical Center and requested that A.W. be examined for possible rape injuries. Nurse Bernadine Madeiros met with A.W. at the hospital. Nurse Madeiros described her role in examining A.W. and other potential rape victims as follows:
It is actually a combined effort with Rape Crisis. We make sure the patient is okay. That she is not injured. We get as much detail as we can about the situation so that we can make sure that something didn't occur that we need to call a physician immediately. We get a reasonable detail of the situation so I know that she isn't bleeding or hysterical or anything immediately.
Nurse Madeiros stated that A.W. described her encounter with "Shelton" and what Shelton had done. A.W.'s description was consistent with her statements to Luttrell and Ethel. In addition, Nurse Madeiros testified that A.W. told her Shelton had penetrated her vagina with his finger. She also testified that A.W. identified her assailant as a black male whom she knew.
Although A.W.'s statements to Nurse Madeiros were hearsay, they were clearly made for purposes of medical diagnosis or treatment and the trial court correctly admitted them under Rule of Evidence 803(4).

D. Confrontation Clause Analysis
Because A.W.'s statements to Luttrell, Ethel, and Nurse Madeiros fell within firmly rooted exceptions to the hearsay rule, their admission did not violate defendant's Sixth Amendment right to cross-examine the declarant. See White, 502 U.S. at 356, 112 S.Ct. at 742-43, 116 L.Ed.2d at 859. In contrast, A.W.'s statements to Officer Fey and Investigator Vincent were not found to fall within a firmly rooted hearsay exception. The court stated in conclusory fashion that these statements were "trustworthy," but it failed to make the necessary, particularized findings that the statements possessed circumstantial guarantees of trustworthiness. See Roberts, 448 U.S. at 66, 100 S.Ct at 2539, 65 L.Ed.2d at 608; State v. Deanes, 323 N.C. 508, 515, 374 S.E.2d 249, 255 (1988), cert. denied, 490 U.S. 1101, 109 S.Ct. 2455, 104 L.Ed.2d 1009 (1989). The record before us does not affirmatively demonstrate that such "circumstantial guarantees of trustworthiness" exist. It was therefore error to admit these statements under the residual hearsay exceptions. This error violated defendant's Sixth Amendment right of confrontation.
Nevertheless, the trial court's error could not have prejudiced defendant. The testimony of Officer Fey and Investigator Vincent regarding A.W.'s description of the rape was almost entirely repetitive of the testimony of Ethel, Luttrell, and Nurse Madeiros, all of which was properly admitted. For this reason, the admission of the testimony of Officer Fey and Investigator Vincent, though error, was harmless beyond a reasonable doubt. See N.C. Gen.Stat. § 15A-1443(b) (1997).

III. Trial Testimony of Dr. Grubb
At trial, Dr. Monty Grubb testified for the State as an expert witness in the field of psychology, specifically in the field of working with, counseling, and treating mentally retarded people. Dr. Grubb has undergraduate, masters, and doctoral degrees in *289 psychology. He is a member of the American Psychological Society and a member of the American Association on Mental Retardation. He has worked in the field of mental retardation as a psychologist since 1976 and has a total of fourteen years of experience working directly with mentally retarded persons. For the past six years before trial, Dr. Grubb worked as a consultant to several organizations in North Carolina that provide group homes for people with mental retardation.
Dr. Grubb testified that over the year he had known A.W., he met with her about once a month for counseling sessions lasting twenty to thirty minutes. He probably "made eye contact" with A.W. at least once a week. Dr. Grubb testified that A.W. was mentally retarded. Based on his experiences and on his review of psychological evaluations performed on A.W., Dr. Grubb testified that A.W. functions around the level of an eightyear-old, both mentally and emotionally. He testified that A.W.'s ability to make informed decisions about "anything complicated" is significantly decreased by her mental retardation. In Dr. Grubb's words, "[S]he can't evaluate a lot of different things and put it together and make a decision in her own best interest most of the time. Weighing all the consequences and all the information is something that she is not very capable of doing."
Dr. Grubb was asked if he had an opinion about how A.W. would react to a sexual advance made by an adult with whom she was only vaguely familiar. He answered, over defendant's objection, that in his opinion A.W. would "respond similarly to an individual who corresponds to her intellectual and adaptive behavior age. She would respond very similar [sic] to an eight-year-old." Dr. Grubb stated that A.W. might be somewhat intimidated and that she might freeze up. According to Dr. Grubb, A.W. might consider the person making the advance "as someone that she is supposed to show respect for because he was a normal functioning adult."
Dr. Grubb went on to testify that in his experience, A.W. is more relaxed around adults with whom she is familiar and that she is more tense around strangers. On redirect, Dr. Grubb reiterated that if sexual advances were made to A.W. by a person with whom she was not substantially familiar, she might "freeze," because her "initial reaction could be so emotionally laden, not realizing what was happening, ... given the emotional nature of the situation." Dr. Grubb also read into evidence, without objection, part of a psychological evaluation indicating that A.W. might easily be taken advantage of by a stranger.
Defendant argues that it was error to allow Dr. Grubb to give an opinion about how A.W. would have reacted to a sexual advance. Expert testimony is admissible if it "can assist the jury in drawing certain inferences from facts and the expert is better qualified than the jury to draw such inferences." State v. Evangelista, 319 N.C. 152, 163, 353 S.E.2d 375, 383 (1987); see N.C.R. Evid. 702. The trial court is given wide discretion in applying this rule and will be reversed only for an abuse of discretion. Id. at 164, 353 S.E.2d at 384.
We cannot say that the trial court abused its discretion in allowing Dr. Grubb to answer the State's hypothetical question. Based on his knowledge of psychology, his many years of experience with mentally retarded persons, his knowledge of A.W.'s psychological evaluations, and his personal interactions with A.W., the trial court correctly allowed him to express an opinion regarding how A.W. would likely have reacted to a sexual advance.

IV. Motion to Dismiss
Defendant was charged in separate indictments with two counts of second-degree rape. The first count alleged that defendant had vaginal intercourse with A.W. by force and against her will, in violation of G.S. 14-27.3(a)(1). The second count alleged that, in violation of G.S. 14-27.3(a)(2), defendant had vaginal intercourse with A.W., that A.W. was mentally defective, and that A.W.'s mental defect was known or should have been known to defendant.
Similarly, defendant was charged in separate indictments with two counts of seconddegree sexual offense: engaging in a sexual *290 act by force and against the will of the victim, G.S. 14-27.5(a)(1), and engaging in a sexual act with a victim who was mentally defective, G.S. 14-27.5(a)(2). The record clearly indicates that the two counts of second-degree rape were based on the same act of vaginal intercourse, and the two counts of second-degree sexual offense were based on the same sexual act.
The jury was instructed on all four counts. Defendant was convicted on all four counts. The trial court arrested judgment on the counts alleging violations of G.S. 14-27.3(a)(1) and G.S. 14-27.5(a)(1).
The only issue raised by defendant with respect to the submission of the four counts to the jury is whether the trial court erred by denying his motion to dismiss all charges. A motion to dismiss on the ground of insufficient evidence should be denied if there is substantial evidence of each element of the offense charged and that defendant was the perpetrator. State v. Lynch, 327 N.C. 210, 215, 393 S.E.2d 811, 814 (1990). In deciding the motion, a court must consider the evidence in the light most favorable to the State. Id.
General Statutes section 14-27.3, which defines the crime of second-degree rape, reads in relevant part:
(a) A person is guilty of rape in the second degree if the person engages in vaginal intercourse with another person:
(1) By force and against the will of the other person; or
(2) Who is mentally defective ... and the person performing the act knows or should reasonably know the other person is mentally defective....
General Statutes section 14-27.5, which defines the crime of second-degree sexual offense, reads in relevant part:
(a) A person is guilty of a sexual offense in the second degree if the person engages in a sexual act with another person:
(1) By force and against the will of the other person; or
(2) Who is mentally defective ... and the person performing the act knows or should reasonably know the other person is mentally defective....
See also N.C. Gen.Stat. § 14-27.1(4) (defining "sexual act"). The crimes of seconddegree rape and second-degree sexual offense thus differ only with respect to the conduct prohibited.
A person is "mentally defective" if she "suffers from mental retardation ... which temporarily or permanently renders [her] substantially incapable of appraising the nature of ... her conduct, or of resisting the act of vaginal intercourse or a sexual act, or of communicating unwillingness to submit to the act of vaginal intercourse or a sexual act." N.C. Gen.Stat. § 14-27.1(1) (1993). Our Supreme Court has indicated that one who is "mentally defective" under the sex offense laws is "statutorily deemed incapable of consenting" to intercourse or other sexual acts. State v. Holden, 338 N.C. 394, 406, 450 S.E.2d 878, 884 (1994). It has further indicated that force is "inherent to having sexual intercourse with a person who is deemed by law to be unable to consent." Id.
Accordingly, if there is substantial evidence that a person has engaged in prohibited sexual conduct in violation of G.S. 14-27.3 or 14-27.5, and that the victim was mentally defective, and that the person performing the act knew or reasonably should have known that the victim was mentally defective, then ipso facto, there is substantial evidence that the person has engaged in such conduct "by force and against the will" of the victim.
In this case, there was substantial evidence that defendant engaged in both vaginal intercourse and a "sexual act" with A.W. There was also substantial evidence that A.W. was mentally retarded, and that defendant knew of A.W.'s retardation. Finally, there was substantial evidence that A.W.'s mental retardation rendered her substantially incapable of "resisting the act of vaginal intercourse or a sexual act." See State v. Oliver, 85 N.C.App. 1, 20, 354 S.E.2d 527, 538, disc. review denied, 320 N.C. 174, 358 S.E.2d 64, supersedeas denied, 320 N.C. 174, 358 S.E.2d 65 (1987). The trial court correctly denied defendant's motion to dismiss.

V. Jury Instructions
The trial court admitted evidence that at the time defendant committed the *291 sexual offenses against A.W., he was on furlough from prison, where he was serving a sentence for armed robbery. Defendant orally requested that the trial court instruct the jury not to consider this fact in its deliberations, but that motion was denied. Because defendant failed to submit his request for instructions in writing in compliance with General Statutes section 15A-1231(a) (1997), the trial court's denial of defendant's motion was not error. See State v. McNeill, 346 N.C. 233, 240, 485 S.E.2d 284, 288 (1997), cert. denied,___ U.S.___, 118 S.Ct. 704, 139 L.Ed.2d 647 (1998).
Finally, defendant argues that the trial court committed plain error by referring to A.W. as a "victim" in its charge to the jury. On the evidence presented, we cannot say that this is one of those rare cases in which the defendant probably would have acquitted had the trial court omitted the word "victim" from its charge to the jury. See State v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983).
No error.
JOHN C. MARTIN and MARK D. MARTIN, JJ., concur.